[No. F018585. Fifth Dist. Mar. 3, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
HELIODORO SALCEDO GONZALES, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of: subparts A, B and D of part I; all but the first sentence and the last four sentences of subpart E of part I; and all of part III.

## Counsel

Jonathan P. Milberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Margaret Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARDAIZ, Acting P. J.**—In the published portion of this opinion, we address the issue of when the prohibiting of the testimony of a witness in a criminal case is an appropriate sanction for a violation of a discovery obligation. (See Pen. Code, § 1054 et seq.) As we shall explain, we conclude that prohibiting the testimony of a witness is not an appropriate discovery sanction in a criminal case absent a showing of significant prejudice and of willful conduct.

A jury found appellant Heliodoro Salcedo Gonzales guilty of having committed the following crimes on or about February 1, 1992: the kidnapping of Juan Trujano (Pen. Code,[1] § 207, subd. (a); count 2); the robbery of Trujano (§ 211; count 3); the kidnapping of Trujano for robbery (§ 209, subd. (b); count 1); the burglary of a dwelling (§ 459; count 4); the robbery of Hermenegildo Valencia-Campos in that dwelling (§§ 211, 212.5; count 5); and the receiving of stolen property (§ 496, former subd. 1; count 6). The jury also found appellant guilty of having committed the following crimes on or about January 2, 1992: the robbery of Onais Arroyo (§ 211; count 7); the robbery of Serafin Garibay (§ 211; count 8); and the attempted robbery of Ramon Arroyo-Muniz (§§ 664, 211; count 9).

The jury found a section 12022, subdivision (a)(1) arming allegation to be true as to counts 1, 2, 3, 4, 5, 7, 8 and 9, and found a section 12022.5 firearm use allegation to be true as to counts 4, 5, 7, 8 and 9.

The court sentenced appellant to an aggregate determinate prison term of 16 years and 6 months on counts 2 through 9 and the accompanying arming and firearm use allegations. It imposed an indeterminate term of life with the possibility of parole on count 1 (kidnapping for robbery), to run consecutive to the aggregate determinate term. He now appeals.

## I. FACTS

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. *Counts 7, 8, 9 — Arroyo and Garibay Robberies, Arroyo-Muniz Attempted Robbery at Gallo Cheese Plant*

On January 2, 1992, about 1 p.m., Serafin Garibay was working with Ramon Arroyo-Muniz and Onais Arroyo outside the Gallo cheese plant near

---

[1]All statutory references hereafter are to the Penal Code unless otherwise indicated.

*See footnote, *ante*, page 1744.

Livingston in Merced County. Witnesses testified appellant and a younger man, Villano, walked up and asked for the foreman. As Garibay pointed to where the foreman would be, appellant pulled out a gun and pointed it at Garibay's right temple. Villano, the younger man, went over to Onais Arroyo. Appellant told the three it was "an assault" and told the men to take everything out of their pockets and give them their wallets. The gun appellant used was the same type of gun Deputy Jones was to recover from appellant's car a month later.

Garibay was afraid, so he took out his wallet, which contained $70 and a check. Appellant took the wallet from him. Appellant then told Ramon Arroyo-Muniz to take everything out of his pockets, but Arroyo-Muniz told appellant he did not have even five cents. When appellant asked Arroyo-Muniz for his wallet, he showed appellant the wallet had no money in it. Appellant knocked the wallet out of his hand, but Arroyo-Muniz managed to grab it right away. Arroyo-Muniz was scared and did not want to give up his wallet. He was afraid he might be shot by appellant or Villano. All the while, appellant kept the gun pointed at Garibay.

Meanwhile, Villano ordered Onais Arroyo to come over to him. Onais Arroyo asked what was going on and Villano said, "Give me your wallet." Onais Arroyo told him he did not have one. Villano demanded, "Give me your money." Arroyo gave Villano eight dollars, which was all the money Arroyo had. Villano had what looked to Arroyo like a machine gun, and Villano pointed it at Arroyo the entire time. The gun looked like the toy automatic weapon Deputy Jones discovered in appellant's car a month later. Arroyo gave Villano the money because Arroyo was afraid that he might get shot.

Right after Arroyo handed over his money, appellant and Villano left together, walking away "fast." They both wore jackets and appellant had on a red cap. Later the plant foreman and Arroyo found Garibay's check in the field and gave it back to him. A piece of Garibay's wallet was also found in the field, but the money that had been in it was not found.

D.  *Count 6 — Receiving Stolen Property*\*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

E.  *Appellant's Defense*

Appellant, who had been previously convicted of forgery and petty theft, testified and denied the Gallo cheese plant robberies or that he was ever there on January 2, 1992.

---

\*See footnote, *ante*, page 1744.

. . . . . . . . . . . . . . . . . . . . . . . . . . . .*

Appellant called 16-year-old Villano to testify on his behalf. Villano's testimony corroborated the essentials of the crime victims' testimonies. Villano admitted his participation in all the crimes and said appellant and he planned the crimes beforehand and that he (Villano) was only following appellant's orders.

Other facts pertinent to this appeal will be discussed below in connection with the discussions of the respective issues to which those facts pertain.

## II.

*Appellant's Contentions*

Appellant contends that (1) he was denied effective assistance of counsel, (2) the court erred in denying his request to call his jail cellmate to testify as a defense witness, and (3) his trial counsel's numerous alleged failings, when coupled with the trial court's refusal to allow appellant to call his cellmate as a witness, were cumulatively prejudicial and require reversal of his convictions for the January 2, 1992, robberies and attempted robbery (counts 7, 8 and 9).[7]

His claim of denial of effective assistance of counsel is based upon four purported errors committed by his trial counsel. Specifically, he contends that his representation was constitutionally deficient in that his trial counsel: (a) failed to enter a plea of former jeopardy after an earlier trial on the same charges had ended in a mistrial; (b) failed to move to sever the trial of the charges alleging the January 2, 1992, crimes (counts 7, 8 and 9) from the charges alleging the February 1, 1992, crimes (counts 1 through 6); (c) improperly called coperpetrator Arturo Zamora Villano to testify as a defense witness (even though trial counsel did this at the express request of

---

*See footnote, *ante*, page 1744.

[7]Appellant also contends that CALJIC No. 2.90, which was given to the jury, improperly permitted conviction upon a lower standard of proof than the constitutionally mandated requirement of proof beyond a reasonable doubt. (See *Cage* v. *Louisiana* (1990) 498 U.S. 39 [112 L.Ed.2d 339, 111 S.Ct. 328].)

The California Supreme Court has rejected a similar contention in *People* v. *Jennings* (1991) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009]. The court recently reaffirmed the *Jennings* holding against a challenge based on *Cage*. (*People* v. *Sims* (1993) 5 Cal.4th 405, 457 [20 Cal.Rptr.2d 537, 853 P.2d 992]; see also *People* v. *Smith* (1992) 9 Cal.App.4th 196, 199-202 [11 Cal.Rptr.2d 645].)

We recognize that the United States Supreme Court has agreed to decide the validity of this state's reasonable doubt instruction. (*Sandoval* v. *California* (1993) __ U.S. __ [125 L.Ed.2d 789, 114 S.Ct. 40].) However, until that court rules otherwise, we consider *Sims, Jennings*, and *Smith* dispositive, and we decline to revisit the issue.

appellant himself, who rejected trial counsel's advice that Villano not be called); and (d) failed to raise a hearsay objection to the admission of appellant's prior misdemeanor convictions for forgery and for petty theft with a prior petty theft.[8]

III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV.

*The Exclusion of Appellant's Cellmate's Testimony*

After the prosecution had presented its case-in-chief and had rested, appellant's trial attorney informed the court that appellant wished to call as a witness appellant's jail cellmate. According to the prosecutor, appellant's trial attorney told the prosecutor that someone had told appellant's trial attorney that the cellmate, Jaime Castillo, "had contact with one or two of" the three victims of the January 2, 1992, Gallo cheese factory crimes and "it was communicated to him that those victims said words to this effect, that they would be unable to identify the persons who robbed them and they didn't feel they could make that identification." The prosecutor added that "I don't necessarily fault counsel necessarily for this but the point is that I'm hearing about this for the very first time this morning." He pointed out that the three victims of those crimes had already testified and had been excused, and that there had been no reason to ask them whether they had ever had any conversations with Jaime Castillo.

Defense counsel attempted to explain the delay in disclosing the identity of Castillo to the prosecution as follows:

"MR. CALLAHAN [Defense Counsel]: If I could address the issue. There's no question there's been a discovery order. However, Mr. Gonzales until the people actually testified yesterday didn't realize [to] the full extent what their names were and when he talked to Mr. Castillo, his cellmate, and I talked to Mr. Castillo during the break over the lunch hour, basically he confirms this. He indicated to Mr. Gonzales that . . . not only does he know them but he knows them extremely well in that . . . Ramon Arroyo is a relative of his wife's and likewise Mr. Garibay is a friend of his, they've been over at his house quite a few times. They've talked about the incident

---

[8]In the unpublished portion of this opinion, we conclude all of appellant's contentions, other than the issue of exclusion of his jail cellmate's testimony, are without merit.

*See footnote, *ante*, page 1744.

that happened back in January of this year and these were all things that took place before Mr. Castillo was even in custody on the present charge and this is what he related to me during the break this morning. I think it was something that wasn't readily available before.

"There's no question we would have discovered it . . . ."

This explanation prompted the following colloquy:

"MR. TRESIDDER [Prosecuting Attorney]: This is something that Mr. Callahan doesn't know but . . . I find that offer of proof from the defendant very suspicious because . . . he was present during the preliminary hearing when each one of these individuals testified.

"And I'll make an offer of proof . . . that in fact members of his family, namely, his mother and another relative were contacting these witnesses at the time of the preliminary hearing asking that they show leniency or sympathy towards this defendant.

"So this idea that he didn't know who was testifying I find very difficult to believe. And, Judge . . . you can see how long ago this preliminary hearing was.

"THE COURT: Well, in addition to the preliminary hearing, if my recollection is correct, these people appeared when we had the motions concerning the photographs.

"MR. TRESIDDER: Three of them did.

"THE COURT: Yes. And Mr. Gonzales was there at that time.

" . . . . . . . . . . . . . . . . . . . . . . . .

"MR. CALLAHAN: The thing that the defendant wanted to indicate to the court was that apparently he had mentioned it to the interpreter yesterday and the interpreter might have mentioned it to me, I don't recall yes or no because of the difference in language, but that would have been the first time that we would have heard about it. Maybe possibly yesterday.

"THE COURT: Mr. Gonzales, I remind you that these victims were at the preliminary hearing many months ago and they also appeared in connection with the first trial so you knew their names from at least the preliminary hearing and secondly from the time around the first trial. These names could not have been new to you.

"MR. CALLAHAN: But in that respect I don't think Mr. Castillo . . . was his cellmate all that period of time however. I know from the other case representing Mr. Vega that Mr. Castillo wasn't in custody—hasn't been in custody that long.

"THE COURT: How long has Mr. Castillo been Mr. Gonzales's cellmate?

"THE DEFENDANT: About 30 days. He just started talking just a little bit ago. He started to talk. I asked him what he said.

"MR. TRESIDDER: And I would say this, Judge, it would appear to me that . . . Mr. Jaime Castillo's . . . been in custody since I believe July the 10th of this year when he was arrested for kidnapping and rape . . . and I again make the same offer of proof that members of the . . . defendant's family were contacting these individuals—these victims who testified from the Gallo Cheese plant at the time of the preliminary hearing.

"I would also offer my own personal offer of proof that when I was informed . . . [of] that . . . I specifically told the defendant's family that the victims wanted no further contact with them at one of the times when the preliminary went or right around that time.

". . . the other issue is . . . in order to do this properly, you'd have to secure these witnesses back here in court . . . I don't think they've shown due diligence to continue the trial to have these people come back here and testify so that they can be allegedly impeached by this other witness . . . ."

The court then ruled as follows:

"THE COURT: Thank you. The court is gonna find that the entire situation is much too suspect and I agree that there has not been diligence which has been shown in this matter. Therefore, I'm going to rule that Mr. Castillo will not be allowed to testify in this trial.

"MR. TRESIDDER: I think—just for the record, I take it the court is showing there has been a violation of the previously ordered discovery.

"THE COURT: Yes.

"MR. TRESIDDER: Thank you. And that the appropriate remedy is not to have him testify.

"THE COURT: That's correct."

■ Appellant now contends that the court erred in refusing to permit Castillo to testify at the trial.

A review of the record makes it clear the trial court was acting under the authority of the reciprocal discovery scheme implemented under Proposition 115. Incorporated into our Penal Code by Proposition 115 is section 1054 et seq. The provisions pertinent to our discussion are sections 1054.3 and 1054.5. Section 1054.3 provides:

"The defendant and his or her attorney shall disclose to the prosecuting attorney:

"(a)   The names and addresses of persons, other than the defendant, he or she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements of those persons, including any reports or statements of experts made in connection with the case, and including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the defendant intends to offer in evidence at the trial.

"(b)   Any real evidence which the defendant intends to offer in evidence at the trial. . . ."

Section 1054.5 states:

"(a)   No order requiring discovery shall be made in criminal cases except as provided in this chapter. This chapter shall be the only means by which the defendant may compel the disclosure or production of information from prosecuting attorneys, law enforcement agencies which investigated or prepared the case against the defendant, or any other persons or agencies which the prosecuting attorney or investigating agency may have employed to assist them in performing their duties.

"(b)   Before a party may seek court enforcement of any of the disclosures required by this chapter, the party shall make an informal request of opposing counsel for the desired materials and information. If within 15 days the opposing counsel fails to provide the materials and information requested, the party may seek a court order. Upon a showing that a party has not complied with Section 1054.1 or 1054.3 and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure.

"(c) The court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted. The court shall not dismiss a charge pursuant to subdivision (b) unless required to do so by the Constitution of the United States. . . ."

The trial court concluded that there was a failure to comply with discovery requirements. Therefore, the court concluded, apparently, that the sanction of prohibiting the defense witness's testimony was appropriate. We disagree.

In *Taylor* v. *Illinois* (1988) 484 U.S. 400 [98 L.Ed.2d 798, 108 S.Ct. 646], the United States Supreme Court addressed the same sanction for failing to comply with a reciprocal discovery statute. During trial, defense counsel in *Taylor* sought to amend his previously furnished witness list to include two additional witnesses who purportedly had seen the incident in issue. Defense counsel notified the court he had just been informed about the witnesses by his client. The *Taylor* court described what happened as follows:

"In response to the court's inquiry about defendant's failure to tell him about the two witnesses earlier, counsel acknowledged that defendant had done so, but then represented that he had been unable to locate Wormley. After noting that the witnesses' names could have been supplied even if their addresses were unknown, the trial judge directed counsel to bring them in the next day, at which time he would decide whether they could testify. The judge indicated that he was concerned about the possibility 'that witnesses are being found that really weren't there.'

"The next morning Wormley appeared in court with defense counsel. After further colloquy about the consequences of a violation of discovery rules, counsel was permitted to make an offer of proof in the form of Wormley's testimony outside the presence of the jury. It developed that Wormley had not been a witness to the incident itself. He testified that prior to the incident he saw Jack Bridges and his brother with two guns in a blanket, that he heard them say 'they were after Ray [petitioner] and the other people,' and that on his way home he 'happened to run into Ray and them' and warned them 'to watch out because they got weapons.' On cross-examination, Wormley acknowledged that he had first met defendant 'about four months ago' (*i.e.*, over two years after the incident). He also acknowledged that defense counsel had visited him at his home on the Wednesday of the week before the trial began. Thus, his testimony rather dramatically contradicted defense counsel's representations to the trial court.

"After hearing Wormley testify, the trial judge concluded that the appropriate sanction for the discovery violation was to exclude his testimony. The judge explained:

" 'THE COURT: All right, I am going to deny Wormley an opportunity to testify here. He is not going to testify. I find this is a blatent [*sic*] violation of the discovery rules, willful violation of the rules. I also feel that defense attorneys have been violating discovery in this courtroom in the last three or four cases blatantly and I am going to put a stop to it and this is one way to do so.

" 'Further, for whatever value it is, because this is a jury trial, I have a great deal of doubt in my mind as to the veracity of this young man that testified as to whether he was an eyewitness on the scene, sees guns that are wrapped up. He doesn't know Ray but he stops Ray.

" 'At any rate, Mr. Wormley is not going to testify, be a witness in this courtroom.' " (*Taylor* v. *Illinois, supra,* 484 U.S. at pp. 404-405 [98 L.Ed.2d at pp. 807-808], fn. omitted.)

The issue came before the high court for resolution of whether exclusion of the witness was a violation of the compulsory process clause of the United States Constitution.[9] The Sixth Amendment provides in part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."

In *Washington* v. *Texas* (1966) 388 U.S. 14 [18 L.Ed.2d 1019, 87 S.Ct. 1920], the court held the right of compulsory process to be applicable to the states. The court stated: "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." (*Washington, supra,* 388 U.S. at p. 19 [18 L.Ed.2d at p. 1023].)

In the final lines of its opinion, the *Washington* court concluded, "[t]he Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use." (388 U.S. at p. 23 [18 L.Ed.2d at p. 1025].)

Reflecting upon this background, the *Taylor* court held: "The right of the defendant to present evidence 'stands on no lesser footing than the other Sixth Amendment rights that we have previously held applicable to the

---

[9] The testimony of Wormley was excluded. The second purported witness "did not appear" at trial. (*Taylor* v. *Illinois, supra,* 484 U.S. at p. 404, fn. 7 [98 L.Ed.2d at p. 807].)

States.' [Citation.] We cannot accept the State's argument that this constitutional right may never be offended by the imposition of a discovery sanction that entirely excludes the testimony of a material defense witness." (484 U.S. at p. 409 [98 L.Ed.2d at pp. 810-811].)

However, the court likewise rejected the assertion of the defense.

"Petitioner's claim that the Sixth Amendment creates an absolute bar to the preclusion of the testimony of a surprise witness is just as extreme and just as unacceptable as the State's position that the Amendment is simply irrelevant. The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly." (484 U.S. at p. 410 [98 L.Ed.2d at p. 811].)

The court then set out considerations for the appropriate imposition of sanctions affecting the presentation of witnesses.

"In order to reject petitioner's argument that preclusion is *never* a permissible sanction for a discovery violation it is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case. It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

"A trial judge may certainly insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial. If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony." (484 U.S. at pp. 414-415 [98 L.Ed.2d at p. 814], italics original, fn. omitted.)

Subdivision (c) of section 1054.5 reflects the same cautionary but permissive note of *Taylor*. It states in relevant part: "The court may prohibit the

testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted." (See also *People* v. *Edwards* (1993) 17 Cal.App.4th 1248, 1265 [22 Cal.Rptr.2d 3].)

Therefore, we glean from *Taylor* the concern that exclusion of evidence necessarily may affect the factfinding process and therefore, ". . . the potential prejudice to the truth-determining function of the trial process must also weigh in the balance." (*Taylor* v. *Illinois, supra,* 484 U.S. at p. 415 [98 L.Ed.2d at pp. 814-815], fn. omitted.) Thus, the court must consider the extent to which exclusion of particular evidence may undermine the reliability of the fact finder's conclusion. Further, the court should consider whether the failure to comply was "willful and motivated by a desire to obtain a tactical advantage."

In evaluating a similar problem, the Ninth Circuit in *Fendler* v. *Goldsmith* (9th Cir. 1983) 728 F.2d 1181, 1188-1190, sought to guide the choice of sanctions by considering the effectiveness of lesser sanctions, the impact of preclusion on the evidence at trial and the outcome of the case, the extent of prosecutorial surprise and whether the violation was willful.

In our view, the consideration comes down to the issue the court is trying to address. Is the court attempting to address prejudice to the surprised party? Is the court seeking to punish the offending party? Is the court seeking to address prejudice and to punish?

To address prejudice, the court would look to whatever remedy would resolve or significantly resolve the disadvantage, for example, a continuance or a delay in presentation of the testimony to allow the surprised party the opportunity to prepare. Some courts have concluded that prejudice may be so severe that exclusion may be the only remedy. (*People* v. *Jackson* (1993) 15 Cal.App.4th 1197 [19 Cal.Rptr.2d 80].) On the other hand, punishment is normally a response to willful conduct and is designed to deter others as well as to ensure there is a consequence for the wrongdoing.

Whether or not conduct was willful, it would be inappropriate for the offending party to gain by his or her conduct the very consequence the discovery statute seeks to avoid. A party who creates prejudice to the other side by surprise or newly listed witnesses should not have the advantage of the disadvantage to which he or she has placed an opponent.

Thus, assuming the consequence of exclusion may be appropriate where the court is only seeking to address prejudice, we conclude that the prejudice would necessarily have to be substantial and irremediable. Further, the

consequence to the truth-finding process would have to be carefully balanced. It should not be lightly considered that the consequence of exclusion of significant evidence may so distort the truth-finding process as to undermine its reliability.

Where punishment is a consideration, the court has available to it a wide array of consequences including fines, contempts, instructions to the jury regarding evaluating the evidence (*People* v. *Zamora* (1980) 28 Cal.3d 88 [167 Cal.Rptr. 573, 615 P.2d 1361]) and exclusion. However, we conclude that absent a showing of significant prejudice and willful conduct, exclusion of testimony is not appropriate as punishment. To conclude otherwise might well place upon the truth-finding process an imprimatur of unreliability inconsistent with confidence in a finding of guilt.

It is appropriate to explain that a coercive order to disclose evidence or comply with discovery orders that results in exclusion for failure to comply represents a different analytical framework than the one before us. In *United States* v. *Nobles* (1975) 422 U.S. 225 [45 L.Ed.2d 141, 95 S.Ct. 2160] the court affirmed the exclusion of testimony of an expert witness for the defense because of refusal to disclose a relevant report.

"The court's preclusion sanction was an entirely proper method of assuring compliance with its order. Respondent's argument that this ruling deprived him of the Sixth Amendment rights to compulsory process and cross-examination misconceives the issue. The District Court did not bar the investigator's testimony. Cf., *Washington* v *Texas* 388 U.S. 14, 19 [18 L.Ed.2d 1019, 1023, 87 S.Ct. 192] (1967). It merely prevented respondent from presenting to the jury a partial view of the credibility issue by adducing the investigator's testimony and thereafter refusing to disclose the contemporaneous report that might offer further critical insights. The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth. Deciding, as we do, that it was within the court's discretion to assure that the jury would hear the full testimony of the investigator rather than a truncated portion favorable to respondent, we think it would be artificial indeed to deprive the court of the power to effectuate that judgment. Nor do we find constitutional significance in the fact that the court in this instance was able to exclude the testimony in advance rather than receive it in evidence and thereafter charge the jury to disregard it when respondent's counsel refused, as he said he would, to produce the report." (*United States* v. *Nobles, supra*, 422 U.S. 225, 241 [45 L.Ed.2d 141, 155], fn. omitted.)

We deal here with a situation of evidence that becomes known after a discovery compliance date and in midtrial. Therefore, as noted in *Nobles*,

there is a distinction between having evidence and refusing to disclose, and discovering evidence and disclosing it at a time when it places the other side at a disadvantage. Further, we perceive as a relevant consideration in determining willfulness that evidence has been or would have been so readily discovered or available that an explanation that it was unknown may well be suspect and be viewed as simply an effort to circumvent discovery requirements.

■ With these principles in mind, we turn to the facts before us. The record does not demonstrate that the court made any finding that the failure to disclose was willful. Nor can we infer such a finding because the present record does not support it. There is no determination of irremediable prejudice or significant prejudice. While the prosecution witnesses had been excused, there is nothing in the record to support the conclusion that those witnesses were unavailable or could not be obtained without significant delay. Therefore, if the sanction of exclusion was imposed because of prejudice, we find no basis to support the course of action taken. If the sanction of exclusion was taken as punishment for failure to comply with discovery orders, we find neither a showing of significant prejudice nor a record supportive of a finding of willfulness. We therefore conclude the exclusion of the testimony of appellant's witness was a violation of the compulsory process clause. The question remains whether the error was harmless.

■ A violation of the compulsory process clause is an error of constitutional magnitude. We therefore must determine whether the error was "harmless beyond a reasonable doubt." *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

■ Respondent argues even if the refusal to permit Castillo to testify had been error, the only effect of that evidence would have been to impeach one or two of the four eyewitness identifications of appellant as having been one of the two perpetrators. There was no offer of proof that there had been any statement by anyone that someone other than appellant had been identified by Serafin Garibay, Onais Arroyo or Ramon Arroyo-Muniz as having been one of the two perpetrators. The only offer was that "one or two" of the victims "would be unable to identify the persons who robbed them." This would not have in any way impeached the identifications of appellant that were made by coperpetrator Villano and the remaining one or two of the three Gallo Cheese factory victims. Therefore, respondent contends the error was harmless.

We do not agree. In a case dependent upon eyewitness identification to establish guilt, the impeachment of one or two of the four eyewitnesses

cannot be viewed as insignificant. While there are circumstances where physical or other unimpeachable evidence would unshakably support guilt, we cannot on this evidence determine at what point a jury's confidence would have been either assured or shaken. Therefore, even though we may have reservations about the probable force of this evidence, we cannot conclude it was harmless beyond a reasonable doubt in the circumstances presented.

## V. DISPOSITION

For the reasons stated, the convictions on counts 7, 8, and 9 (the robberies and attempted robbery at the Gallo Cheese plant) are reversed. In all other respects the judgment is affirmed.

Thaxter, J., and Harris, J., concurred.