Filed 1/8/15  P. v. Davis Ca4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066680 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV1002033) |
| KENLEY ALEXANDER DAVIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino, Mary E. Fuller, Judge.  Affirmed as modified.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Kenley Alexander Davis of first degree murder (Pen. Code,[1] § 187, subd. (a); count 3); possession of a firearm by a felon (§ 12021, subd. (a)(1); count 4); street terrorism (§ 186.22, subd. (a); count 5); and evading a peace officer with willful disregard for safety (Veh. Code, § 2800.2, subd. (a); count 6). The jury found true an allegation that Davis in count 3 personally and intentionally discharged a firearm and committed the crime for the benefit of a criminal street gang (§§ 12022.53, subd. (d); 186.22, subd. (b)(1)(C)) and the court found true a prior serious/violent felony conviction (§ 1170.12, subds. (a)-(d)). The court sentenced Davis to prison for an indeterminate term of 86 years four months to life.

On appeal Davis contends the court erred when, as a discovery sanction, it prevented a defense witness from testifying. Specifically, Davis contends the court abused its discretion by not exhausting other less severe sanctions before excluding the witness's testimony and that this error violated his Sixth and Fourteenth Amendment rights to present a defense. Davis also contends that the court failed sua sponte to correct the standard first degree murder instruction (CALCRIM No. 521) and that the 10-year gang enhancement in count 3 must be stricken.

We agree with Davis that the 10-year gang enhancement imposed under section 186.22, subdivision (b)(1)(C) must be stricken because the underlying felony is punishable by a life term. We therefore conclude Davis's sentence must be modified to

---

[1] Statutory references are to the Penal Code unless otherwise specified.

show he is not eligible for parole for a minimum of 15 years (§ 186.22, subd. (b)(5)). We otherwise affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

Davis was originally charged with three codefendants, Deandre Williams, Rashen Turner, and Justin Smith. The court granted Davis's motion to sever. The case proceeded to trial.

Prosecution

Davis was an active member of the Noe Luv criminal street gang in Rialto.[2] In July 2008, Davis went to a house party with Williams and Turner. Williams, known by the gang moniker Blamma, was a member of a different gang but affiliated with Noe Luv members. Turner was a member of Noe Luv and went by the nickname Goldie. All Noe Luv members typically carried guns.

Chris Jackson hosted the party to celebrate his birthday. Jackson was not a gang member. Jonita Simpkins, Ashley Brown, and Tiana Finney, all friends of Jackson and also not members of any gang, were at the party together. The three women were familiar with gang members Davis, Williams, and Turner.

While in the backyard, Simpkins observed that Davis and Williams were "gang-banging" "roughly throughout the whole party." Gang-banging is "when you're yelling

_____

[2] The People correctly concede that the gang enhancement attached to the murder conviction cannot be imposed in this case. Thus, we do not discuss the substantial evidence of Davis's involvement in the Noe Luv gang or the evidence surrounding other criminal acts committed by the gang.

3

out where you're from and you're throwing up signs with your fingers."  Davis and Williams were repeatedly saying "Noe Luv Crip."

At some point, Williams accidentally elbowed Simpkins in the face.  Williams refused to apologize to Simpkins, instead asking her if she wanted to get "popped."  The argument escalated to screaming and yelling between Simpkins, Williams, and Davis.

Jackson approached and asked all three of them to calm down.  Jackson asked Davis and Williams to stop gang banging or leave his party.  Davis and Williams refused and then directed their gang banging toward Jackson, yelling, "This is Noe Luv.  F-you.  We don't give a crap about your party."  Jackson ultimately gave up on his efforts to get Davis and Williams to stop gang banging.  He turned around and walked away with one arm around Simpkins and the other around Finney.

While Jackson was still within arm's reach, Davis pulled out a gun and shot Jackson in the head.  Jackson fell to the ground and everyone scattered.  Jackson died from the gunshot wound the following day.

Simpkins and Finney remained at the house with Jackson.  Both witnesses told homicide Detective Daniel Delgado that Davis was the shooter.[3]  The recorded tapes of their police interviews, taken the evening of the shooting, were played for the jury.

Six days after the shooting, Detective Delgado and his partner were in an undercover police car patrolling an apartment complex.  They spotted Davis getting into a

---

[3]    Detective Delgado separately showed Simpkins and Finney a six-pack photographic line-up the day after the shooting.  They both quickly selected Davis's photograph from the line-up.

black Nissan. They followed Davis as he drove onto the State Route 60 freeway and waited for a marked patrol unit to arrive before turning on their emergency lights. When the marked patrol unit arrived with emergency lights flashing, Davis initially yielded to the right. At this point several other unmarked patrol cars were also on the side of the freeway to apprehend Davis.

Officers opened their doors with guns drawn and gave commands to Davis, but within seconds Davis sped off onto the freeway, leading law enforcement on a high speed pursuit. Davis reached speeds of up to 140 miles per hour. He exited the freeway and continued at a high rate of speed through the streets of Riverside and Rialto, running over 30 red lights, swerving, and colliding with other cars.

After police pursued Davis for approximately 30 miles, he abandoned his car in a residential area and fled on foot. A helicopter monitored Davis as he jumped over fences, ran through several backyards and into a relative's house. Law enforcement, including SWAT teams from Riverside and Rialto, surrounded the house. Davis's family members came out and confirmed that Davis was still inside, hiding in the attic. Davis ultimately surrendered to authorities three hours later.

At trial, Simpkins, Finney and Brown described what they saw just before Davis shot Jackson. Simpkins saw Davis pull the gun from his waistband. Finney testified that she saw Davis, Williams and Turner huddle together just before Davis shot Jackson. Finney thought Williams handed Davis something silver in the huddle. Brown also thought that the gun Davis used may have come from Williams or Turner.

5

Defense

Williams testified on Davis's behalf and claimed that Davis was not the shooter. Williams stated he was a member of the "Nutty Blocc Crips" from Compton but associated with members of the Noe Luv gang, including Davis and Turner.

Williams testified he was "[a]bsolutely positive" that Davis did not shoot Jackson. According to Williams, he and Davis were standing "face-to-face" with Jackson when "a gun came over [ . . . ] and shot" Jackson. There were people from other gangs at the party, including someone known as "Capone" from the "6-0." Williams identified Capone as the individual who shot Jackson.

Four months prior to Davis's trial, Williams was convicted of a felony after he threatened Simpkins in connection with her appearing as a witness in Jackson's murder case.[4]

The record shows Williams testified about Jackson's shooting during his own trial, which took place four months before Davis's. Williams in his own trial denied seeing who the shooter was and gave no testimony about the possible identity of the shooter. Williams also did not testify that Davis was not the shooter.

---

[4]    Williams also admitted during cross-examination he was previously convicted of robbery, twice convicted of being a felon in possession of a firearm, and once for street terrorism.

6

DISCUSSION

I

*EXCLUSION OF A DEFENSE WITNESS*

Davis first contends the trial court abused its discretion when it precluded witness Marcus Boykins from testifying during the defense's case-in-chief.

A.  Additional Background

On May 29, 2013, a few hours before the People rested their case-in-chief, defense counsel sent the People a written statement of Marcus Boykins.  The People were not aware of defense counsel's intention to call Boykins as a witness at trial and had no prior notice of the substance of Boykins's proposed testimony.  The statement of Boykins is not in the record.

Apparently there was some discussion of Boykins off the record early on in the trial because the court mistakenly believed that defense counsel referred to Boykins as a potential witness during his opening statement.  The prosecutor also indicated that Boykins was named at the beginning of trial, however, there is no mention of Boykins in the record before May 29, when defense counsel sent the prosecutor Boykins's written statement.  In any event, the prosecutor was not informed of defense counsel's intention to call Boykins as a witness until the last day of the People's case-in-chief.

The prosecutor objected to the late notification of Boykins as a defense witness, arguing the last minute "discovery of a statement that is absolutely germane to the whole case . . . highly prejudices us in our presentation of the case with a witness that comes forward on the last day of trial."  When the court asked defense counsel why the

7

prosecutor had not been given the written statement sooner, since defense counsel

"obviously had some idea what [Boykins] was going to say," defense counsel explained:

> "We interviewed Mr. Boykins on the 19th of May. The report was prepared on the 20th. Even up until I left here yesterday afternoon, I can say I had no intention of calling Mr. Boykins. It wasn't until last night, after meeting with my investigator, who spent a considerable amount of time speaking to Deandre Williams, as well as Mr. Davis that we decided, okay, maybe we should call Mr. Boykins. I provided that discovery.
>
> [¶] . . . [¶]
>
> ". . . I'd still like to call him, even if the Court was to issue an instruction regarding late discovery . . . strategically I did not indicate to the Court I intended to call witnesses . . . . I do not think it's a technical discovery violation. It's certainly information I had. My duty is triggered when the decision is made to call this person as a witness. The decision was made."

The court ruled to preclude Boykins from testifying, noting that defense counsel's

"duty to give discovery is when you think that there is a possiblity." Because defense

counsel mentioned Boykins early on in the trial and "obviously . . . sat on it and it's in the

nature of an alibi witness," the court found his disclosure of Boykins's statement

untimely. The court did not consider the possibility of imposing a less severe sanction.

Defense counsel made no offer of proof about what the substance of Boykins's testimony

would have been and the written statement of Boykins is not in the record.

After the court sentenced Davis, he made the following statement: "I just wanted

to say that I've been wrongfully convicted and charged with this crime. I feel somewhere

my constitutional rights have been violated. A witness wasn't let in, plus other people in,

that made statements that they seen another shooter do this crime.  I just wanted to say I didn't do this crime."  The court told Davis that he could raise those issues on appeal.

### B.  Guiding Principles

We review a trial court's exclusion of evidence under the abuse of discretion standard.  (*People v. Avila* (2006) 38 Cal.4th 491, 578.)

No order for discovery can be made in a criminal case except as provided in title 6, chapter 10 of the Penal Code.  (§ 1054.5, subd. (a).)  If the defense does not comply with its discovery obligations under section 1054.3, the trial court may make any order necessary to enforce those obligations, "including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.  Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure."  (§ 1054.5, subd. (b).)

Although a trial court has discretion in these matters, that discretion is not unfettered:  "[t]he court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted."  (§ 1054.5, subd. (c).)  "[P]rohibiting the testimony of a witness is not an appropriate discovery sanction in a criminal case absent a showing of significant prejudice and of willful conduct."  (*People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1747, 1758.)

### C.  Analysis

To preserve on appeal a claim concerning the improper exclusion of evidence, the defendant must make an offer of proof to inform the judge's ruling.  (Evid. Code, § 354,

subd. (a); *People v. Valdez* (2004) 32 Cal.4th 73, 108 (*Valdez*).) " 'This is in accord with "the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court *on the ground sought to be urged on appeal.*" ' " (*Ibid.*; original italics.)

As we previously mentioned, defense counsel did not make an offer of proof as to the substance of Boykins's proposed testimony. Defense counsel possessed a written statement of Boykins, but that statement is not in the record for our review. Although the testimony appears to have been exculpatory because the trial court referred to Boykins as an "alibi witness," any conference between the court and the parties about the testimony was off the record. The parties were apparently privy to the substance of Boykins's testimony; we are not. Davis cannot demonstrate prejudice without establishing the substance and relevance of Boykins's proposed testimony. (See *People v. Vines* (2011) 51 Cal.4th 830, 868-869 (*Vines*).) Thus, because Davis has not made an adequate record for us to determine whether the court abused its discretion in excluding that evidence, we conclude the issue is not properly before us on appeal.[5] (See *People v. Eid* (1994) 31 Cal.App.4th 114, 126 ["Failure to make an adequate offer of proof precludes consideration of the alleged error on appeal."].)

---

5       We observe that the trial court may have erred in excluding the evidence because it did not heed the procedure set forth in section 1054.5, subdivision (c), which required the court to consider or exhaust other sanctions before it excluded the testimony of Boykins. However, absent an offer of proof, we cannot assess the impact of the court's decision to exclude the testimony without considering lesser sanctions. Davis does not argue on appeal that defense counsel was ineffective for failing to make a formal offer of proof. If he wishes to do so, the proper way to seek relief is by writ of habeas corpus filed in the trial court. (See *People v. Lucas* (2014) 60 Cal.4th 153, 307.)

Davis next contends that the jurors were not properly instructed on second degree murder because the version of CALCRIM No. 521 given omitted the language that if a murder is not willful, deliberate, and premeditated, "all other murders are of the second degree." He thus argues his due process rights were violated and his first degree murder conviction should be reversed. We find no error.

## A. Additional Background

A discussion of the jury instructions was held on the record outside the presence of the jury. The court examined the CALCRIM No. 521 instruction, noting that prior versions of CALCRIM No. 521 had additional language that if the jury did not find premeditation and deliberation, all other murders were second degree murder:

> "THE COURT: And then there should be all other murder --
>
> "Prosecutor: Murder without premeditation and deliberation is second degree murder.
>
> "THE COURT: Right. There used to be an instruction to that."

To make CALCRIM No. 521 clearer, the court suggested the last paragraph of the instruction be modified from, "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder *rather than a lesser crime*," to read "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder *rather than second degree murder*." (Italics added.) Both parties agreed to this change.

11

Before the close of the People's case, the record shows the parties again discussed the final jury instructions. Defense counsel neither objected nor asked the court to clarify or amplify any instructions, including CALCRIM No. 521.

The court then instructed the jury as follows using CALCRIM No. 520: "The defendant is charged in Count 3 with murder in violation of Penal Code Section 187. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant committed an act that caused the death of another person, and two, when the person acted he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought: Express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. [¶] The defendant acted with implied malice if, one, he intentionally committed an act; two, the natural, probable consequences of the act were dangerous to human life; three, at the time he acted he knew his act was dangerous to human life; and, four, deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] An act causes death if the death is the direct, natural and probable consequence of the act and death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] In deciding whether the consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] If you decide the defendant committed

12

murder, *you must then decide whether it is murder of the first or second degree.*" (Italics added.)

The court next instructed the jury using CALCRIM No. 521: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation. [¶] The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and knowing the consequence decided to kill. [¶] The defendant acted with premeditation if he decided to kill before completing the acts that caused that death. The length of time a person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. [¶] *A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.* On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of reflection not the length of time. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder, *rather than second degree murder.* If the People have not met this burden, *you must find the defendant is not guilty of first degree murder.*" (Italics added.)

The court did not add the language to CALCRIM No. 521 that, if a murder is not committed with premeditation and deliberation, "all other murders are of the second degree." Defense counsel did not object to the instruction as given.

13

## B. Guiding Principles

Davis maintains that between the versions of CALCRIM Nos. 520 and 521 given, the instructions did not distinguish between first and second degree murder because CALCRIM No. 521 omitted the language that if a murder is not of the first degree "all other murders are of the second degree." The People respond that Davis forfeited his claim of instructional error by failing to request a clarifying instruction at the time and in any event, his claim is meritless because the court properly instructed the jury on the elements of first and second degree murder, and the People's burden of proof.

Preliminarily, we note that the CALCRIM No. 521 instruction given in this case correctly stated the law despite the omission of the sentence "all other murders are of the second degree." Davis argues that the court had a sua sponte duty to modify CALCRIM No. 521 in an attempt to circumvent the rule that " 'a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 (*Hudson*).)

Here, as noted, defense counsel did not ask the trial court to clarify or amplify the instruction. The court suggested that CALCRIM No. 521 needed clarification and then made the changes it thought were necessary. Defense counsel did not object to the omission of the language "all other murders are of the second degree" when the final

14

instruction was read to the jury. Thus, we conclude Davis has forfeited his claim of error in giving the instruction.[6] (See *People v. Lee* (2011) 51 Cal.4th 620, 638.)

Even if Davis had properly preserved his claim of instructional error for appeal, we find it without merit. We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "The trial court has a sua sponte duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid.*) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*Ibid.*)

First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) Malice may be express (i.e., intent to kill) or implied (i.e., intentional commission of life-threatening act with conscious disregard for life). (*Ibid.*) Second degree murder is an

---

6    Davis also argues that even if there was no sua sponte duty to modify CALCRIM No. 521, his claim is not forfeited because the court indicated it would modify the instruction and defense counsel had a right to rely on the court's representation. We disregard this argument because, as noted, the instruction was correct in law and it was defense counsel's duty to request clarifying language when the court proposed the final instructions to the parties. (See *Hudson*, *supra*, 38 Cal.4th at pp. 1011-1012.)

unlawful killing with malice, but without the elements of premeditation and deliberation, which elevate the killing to first degree murder. (*Ibid.*)

Here, we conclude between CALCRIM Nos. 520 and 521 that the jury was properly instructed on second degree murder. The record shows the court instructed the jury with CALCRIM No. 520 that if it decided Davis committed murder, it had to decide whether *it is of the first or second degree*. The jury was then instructed with CALCRIM No. 521 that to find Davis guilty of first degree murder, the People must prove that he acted willfully, deliberately and with premeditation. The instruction further explained that *a decision to kill made rashly, impulsively, or without careful consideration is not deliberate or premeditated*. The instruction reiterated the People's burden of proof on this issue: the People must prove beyond a reasonable doubt that the killing was first degree murder *rather than second degree murder*, and if the People did not meet this burden, the jury had to find Davis not guilty of first degree murder.

Thus, the instructions plainly differentiated between first and second degree murder and properly instructed the jury on the People's burden to prove beyond a reasonable doubt Davis committed first degree, rather than second degree murder. The People's theory was that Davis shot the victim with premeditation and deliberation because it is common in gang culture to seek out "an excuse to kill somebody," and Davis huddled with other gang members just before the shooting. The defense theory was that Davis did not shoot the victim. Accordingly, the only theory upon which the jury could have found Davis guilty of second degree murder was if it failed to find beyond a reasonable doubt that Davis committed the murder with deliberation and premeditation.

16

The jurors were properly instructed on this point. When viewed as a whole, the language omitted from CALCRIM No. 521 that murder without premeditation and deliberation is second degree murder is superfluous.[7]

We also point out that even if we were to conclude that the court did allegedly err in giving the instruction, it is not reasonably probable that Davis would have obtained a more favorable result absent any error. We review the effect of failure to instruct on a lesser included offense under the *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) standard. (See *People v. Breverman* (1998) 19 Cal.4th 142, 178, citing *Watson, supra*, at p. 836 [reversal is warranted if it appears reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred].) The People presented evidence that Davis committed first degree murder by acting with premeditation and deliberation. Davis did not present any evidence that he committed second rather than first degree murder. Instead, defense counsel presented one witness, Williams, who claimed that Davis was not the shooter. The jury rejected that evidence.

Further, after closing arguments the court explained to the jury that it would receive verdict forms for the murder charge and that its choices were to find Davis guilty

---

[7]     We note that the omitted language, "all other murders are of the second degree" was included in the 2009 version of CALCRIM No. 521, but subsequently was removed from the revised Fall 2010 version. (See CALCRIM No. 521 (Fall 2009 ed.) p. 232; CALCRIM No. 521 (Fall 2010 ed.) p. 231.) That language was not added back into the version of CALCRIM No. 521 used in Davis's case or the most recent version of CALCRIM No. 521, but the last paragraph of the instruction has been made clearer to read: "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder." (See CALCRIM No. 521 (2014) p. 246.)

of first degree murder, second degree murder, or not guilty of murder. The jury was then given the verdict forms for both degrees of murder. Thus, the jury knew by reading the verdict forms it could convict Davis of second degree murder if it did not find him guilty of first degree murder.

Moreover, the evidence supports the jury's finding that Davis committed the murder with premeditation and deliberation. The record shows Davis was an active member of the Noe Luv gang and that Noe Luv gang members frequently carried weapons. Davis and other Noe Luv members were at the victim's party, armed, repeatedly stating the name of their gang. When the victim asked Davis to stop or otherwise leave the party, Davis refused. Davis, Williams, and Turner conversed briefly in a huddle, likely about their decision to shoot the victim, before Davis shot the victim in the head at close range. At trial, three eyewitnesses, Simpkins, Finney, and Brown, testified that Davis was the shooter.

On this record, we are satisfied that the jurors understood that first degree murder requires proof of premeditation and deliberation, while second degree murder does not. The jury found beyond a reasonable doubt that Davis committed the murder with premeditation and deliberation. There was no error in giving the instruction.

III

*GANG ENHANCEMENT*

Davis maintains and the People concede that Davis's sentence must be modified to strike the 10-year enhancement imposed under section 186.22, subdivision (b)(1)(C) for committing a murder for the benefit of a criminal street gang. We agree.

18

According to section 186.22, subdivision (b)(5), the 10-year gang enhancement cannot be imposed when the defendant has been convicted of a felony punishable by life imprisonment. (See *People v. Williams* (2014) 227 Cal.App.4th 733, 740.) Instead, the trial court should have imposed a minimum parole eligibility period of 15 years. (§ 186.22, subd. (b)(5).) We therefore modify the judgment to delete the 10-year gang enhancement on count 3 and to insert the 15-year minimum term for parole eligibility.

DISPOSITION

The judgment is modified to delete the 10-year gang enhancement imposed under section 186.22, subdivision (b)(1)(C) on count 3 and to replace it with the 15-year minimum term for parole eligibility required by section 186.22, subdivision (b)(5). The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation a certified copy of an amended abstract of judgment that reflects that modification. As so modified, the judgment is affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


McINTYRE, J.

19