Filed 5/11/16  P. v. Moore CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JASON HARLEY MOORE,<br><br>    Defendant and Appellant. | D069310<br><br><br> (Super. Ct. No. SWF10001680) |

APPEAL from a judgment of the Superior Court of Riverside County, Timothy F. Freer, Judge.  Affirmed.

Elisa A. Brandes, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Collette C. Cavalier and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Jason Harley Moore guilty of assaulting a child by means of force likely to produce great bodily injury, resulting in death of the child.  The trial court sentenced Moore to an indeterminate sentence of 25 years to life in prison.  Moore

appeals, contending the trial court abused its discretion in precluding him from calling an expert witness. Should we disagree and conclude the trial court properly excluded the expert witness based on deficiencies in defense counsel's representation, Moore alternatively argues that he received ineffective assistance of counsel.

We conclude the trial court did not abuse its discretion in precluding the expert witness testimony and, to the extent defense counsel provided ineffective assistance, the error was harmless.

FACTUAL AND PROCEDURAL BACKGROUND

On July 27, 2010, Jane Doe, who was about three and a half months old, lived with Laura Morales, her mother, and Moore, her father, in Hemet, California. While Morales worked, Moore stayed home to care for Doe. That afternoon, Morales got a phone call from Moore telling her that she needed to hurry home because Doe had stopped breathing. When paramedics arrived at the home, Doe appeared slightly blue, was not breathing and was in cardiopulmonary arrest, meaning her heart was beating but not effectively.

Doe eventually arrived at Loma Linda University Medical Center (Loma Linda) where she died from her injuries about a week later. Dr. Mark Massi, a forensic pediatrician, examined Doe when she arrived at Loma Linda. Doe had elevated intracranial pressure and her entire brain was swelling. Dr. Massi noted subdural bleeding in Doe's brain which, for a child of Doe's age, is mainly caused by some sort of trauma such as shaking. Dr. Massi also observed extensive retinal bleeding which suggested that Doe has suffered child abuse.

Dr. Massi felt a swollen area on the right side of Doe's head and the ridge of a skull fracture, consistent with a fracture he saw on a CT scan of Doe's head. Looking at a 3D rendering of Doe's skull, Dr. Massi explained that Doe suffered a fracture of the right parietal bone that continued past the suture (fibrous tissue between the skull bones that allow the skull to compress during birth) into the temporal bone. This fracture suggested to Dr. Massi that Doe suffered a traumatic event.

Dr. Massi stated that in falls from a distance of two to three feet, such as from a bed, a child may suffer a skull fracture, but opined that Doe had suffered injuries more traumatic than a "common household injury." Although Dr. Massi observed no bruising on Doe's body that would suggest she had been shaken, he opined that Doe had been shaken, that the shaking caused the skull fracture, and Doe's injuries were due to nonaccidental abusive head trauma.

Dr. Mark McCormick, a forensic pathologist, performed an autopsy on Doe. In examining Doe's skull, Dr. McCormick noted a fracture to the right parietal area of the skull that extended into a suture. Dr. McCormick opined that a fall from a bed would not have caused the fracture and brain injuries similar to Doe's, even if she had hit her head on a wooden bed frame. Dr. McCormick believed Doe's injuries were of the type he would expect to see in an unrestrained infant involved in a car accident or from a fall out of a second or third story building onto concrete. In Dr. McCormick's opinion, Doe's injuries were likely inflicted and not accidental.

Dr. Christina Stanley, a forensic pathologist and neuropathologist, examined Doe's preserved brain. She testified that the location of the subdural hemorrhaging suggested

3

inflicted head trauma. Dr. Stanley opined that the hemorrhaging Doe suffered was inconsistent with a three-month-old infant falling off a bed. Dr. Stanley agreed with Dr. McCormick that the injuries Doe suffered had been inflicted and were consistent with abusive head trauma.

Moore testified on his own behalf. Moore stated that he set Doe on the bed and went to take a shower. From the shower, Moore heard Doe crying loudly. He left the shower and found Doe on the floor. Doe cried as Moore checked to see if she had broken any limbs. A short time later as Moore held Doe, she went limp and stopped breathing. Moore began administering CPR as he called 911 and Morales. Moore never mentioned to Morales, the paramedics or law enforcement that Doe had fallen. At trial, Moore admitted staging the bed with blankets to make himself look better.

Dr. Ronald Gabriel, a pediatrician and neurologist, prepared a report for the defense stating that Doe had suffered a skull fracture. Similar to Dr. Massi, Dr. Gabriel testified that a three- or four-month-old infant could suffer a parietal skull fracture from a fall of one to two feet from a bed onto the floor. With respect to Doe, Dr. Gabriel opined that Doe could have suffered a parietal skull fracture falling from a bed and hitting a hard railing during the fall. At trial, Dr. Gabriel changed his opinion and stated that Doe had not suffered a skull fracture and what he initially believed was a skull fracture, was actually a "congenital accessory variant suture" or anomalous suture that was there long before Doe's birth.

Dr. Gabriel concluded that Doe suffered a fall and after she stopped crying, Doe had an apnea spell and stopped breathing. This caused her to turn blue which meant that

4

she was not getting enough oxygen. Lack of oxygen caused the heart to stop, which in turn stopped the flow of blood to Doe's brain. The lack of blood flow to the brain caused Doe's brain cells to die. He explained that when the cells start to die, the brain swells. As the brain swells, it takes the path of least resistance and begins poking through the sutures, which, in Dr. Gabriel's opinion, ultimately resulted in Doe's death.

Dr. Gabriel believed the subdural and subgaleal hemorrahaging that Doe suffered were the result of the combination of a fall to the floor and a blood clotting deficiency noted by the hospital upon her admission. With respect to the notion that retinal hemorrhaging indicated abuse, Dr. Gabriel testified that this has been proven false on many occasions. World literature on this subject and his personal experience indicate that such hemorrhaging cannot be used as a diagnostic tool because it can result from clotting problems, leukemia, or infections. The retinal hemorrhaging did not surprise Dr. Gabriel because of Doe's blood clotting problem and the very high pressure in her brain.

## DISCUSSION

### I. *Exclusion of Expert Testimony*

A. Background

At the preliminary hearing, Dr. Massi testified that when he examined Doe's scalp he felt swelling and a ridge that was later determined to be a linear parietal fracture. He testified that a child *could* sustain a skull fracture after falling from a bed onto either a carpeted or hard floor, whether or not the child hit a wood railing on the way to the floor.

5

He also testified that the skull fracture did not cause the retinal hemorrhaging and opined that Doe had been shaken.

Based on Dr. Massi's preliminary hearing testimony, defense counsel did not provide Dr. Gabriel with all of the CT scans and instructed him to not spend time on the skull fracture because defense counsel believed Dr. Massi had conceded that the skull fracture could have resulted from a short fall. During trial, defense counsel believed that Dr. Massi testified for the first time that Doe's fracture was inconsistent with a fall from a bed because it extended into the temporal bone. During an extended trial recess, defense counsel gave Dr. Gabriel a 3D CT image of Doe's skull that counsel possessed, but previously had not provided to Dr. Gabriel, and asked him to determine whether the skull fracture extended into the temporal bone.

The following day, Dr. Gabriel told defense counsel that after examining the 3D imaging scan he suspected that, in fact, no fracture existed. Dr. Gabriel had taken the scan to Dr. James D. Collins, a board certified radiologist for consultation. Dr. Collins opined that Doe had been misdiagnosed and that the scan actually showed an "anomalous parietal suture." Defense counsel filed an emergency request for funding to have Dr. Collins prepare a report and notified the prosecution of the request. Thereafter, defense counsel made an oral request and a number of written requests to allow Dr. Collins to testify at trial or declare a mistrial. Defense counsel and the court made an extensive record regarding this issue.

The trial court ultimately ruled that allowing Dr. Collins to testify would be unfair because the prosecution did not receive information regarding Dr. Collins until after the

6

trial had started, Dr. Collins's CV consisted of 126 pages and it could take weeks for the prosecution to do a basic investigation. The trial court concluded that an "unintentional" discovery violation had occurred when the defense provided new information to the prosecution mid-trial because the defense had all of the information Dr. Gabriel needed to have reached his revised opinion before trial, but Dr. Gabriel never asked for the 3D scan.

The trial court allowed Dr. Gabriel to testify as to why his opinion regarding the skull fracture changed, that he had consulted with Dr. Collins and that Dr. Collins was a distinguished radiologist. The trial court explained, under the circumstances, it fashioned its ruling to protect Moore's due process rights.

B. Analysis

Moore asserts the trial court erred in determining that the defense had violated the discovery rules and claims the trial court abused its discretion imposing any sanction. He argues the late discovery resulted from the defense's reliance on Dr. Massi's preliminary hearing testimony and the prosecution's pretrial representation that it had no additional statements to disclose. Moore asserts the trial court missed the point regarding the significance of the change in Dr. Massi's opinion between the preliminary hearing and trial. In making this argument, Moore contends the prosecution committed a discovery violation by not disclosing Dr. Massi's statements about the nature of the fracture. Assuming a defense discovery violation occurred, Moore argues the trial court erred by imposing the most severe discovery sanction of precluding Dr. Collins's testimony. Moore also claims the trial court abused its discretion in excluding Dr. Collins's testimony under Evidence Code section 352. We are not persuaded.

7

Discovery in criminal cases is governed by statute. (Pen. Code, § 1054 et seq.) The prosecution is required to disclose all written or recorded statements of witnesses who are expected to be called at trial. (Pen. Code, § 1054.1, subd. (f).) The defense must disclose to the prosecutor the names and addresses of persons the defendant reasonably anticipates will likely be called as witnesses at trial and provide any relevant written or recorded statements of those witnesses. (Pen. Code, § 1054.3, subd. (a)(1).) A court may prohibit the testimony of a witness "only if all other sanctions have been exhausted." (Pen. Code, § 1054.5, subd. (c).) "[P]rohibiting the testimony of a witness is not an appropriate discovery sanction in a criminal case absent a showing of significant prejudice and of willful conduct." (*People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1747, 1758.) We generally review a trial court's discovery ruling for an abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

Additionally, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. (Evid. Code, § 352.) Evidence is more prejudicial than probative if it poses an intolerable " 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) We review a trial court's exercise of discretion in admitting or excluding evidence for abuse and will not disturb the ruling "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

As a threshold matter, we reject Moore's contention that the prosecution committed a discovery violation by not disclosing Dr. Massi's statements about the nature of Doe's fracture. Defense counsel had a copy of Dr. Massi's report which noted that Doe suffered a "parietal skull fracture possibly extending into the temporal bone." During trial, defense counsel tried to impeach Dr. Massi's testimony that the complex nature of Doe's skull fracture indicated her fracture did not occur from a common household fall, with Dr. Massi's preliminary hearing testimony. At the preliminary hearing, Dr. Massi stated that Doe could have suffered a linear skull fracture falling from a bed and it would not be surprising for "an infant" falling from a bed and not hitting anything on the way down to suffer a skull fracture. The trial court found there was no inconsistency "if the question specifically wasn't asked at the preliminary hearing, or if it isn't covered, or he doesn't mention it's a complex fracture, doesn't talk about it…." After reviewing the preliminary hearing transcript, we agree that neither the People or defense counsel specifically asked Dr. Massi at the preliminary hearing about the finding in his report regarding the nature of Doe's fracture, nor what this finding implied regarding how Doe's injuries might have occurred. For this reason, we reject Moore's contention that the prosecution committed a discovery violation.

Accordingly, we turn to Moore's argument that the trial court erred when it excluded Dr. Collins's testimony under Evidence Code section 352 and because the defense violated the discovery rules. As a reviewing court, we look at the result reached by the trial court, and not its rationale. (*People v. Zapien* (1993) 4 Cal.4th 929, 976.) Accordingly, because a sanction for a violation of the discovery rules or a ruling under

9

Evidence Code section 352 is reviewed for an abuse of discretion, we proceed directly to whether the trial court abused its discretion when it excluded Dr. Collins's testimony.

First, before deciding to exclude Dr. Collins's testimony, the trial court evaluated its options under Penal Code section 1054.5, including sanctioning defense counsel, granting a continuance, or reading jury instructions on late discovery. The trial court rejected these options finding defense counsel had done nothing wrong as Dr. Gabriel could have asked for any additional material from defense counsel before formulating his opinion, a lengthy continuance would be required to address the prejudice to the prosecution and a jury instruction would not address the prejudice to the prosecution.

The trial court concluded it would be fundamentally unfair to the prosecution if it allowed the defense to introduce Dr. Collins's testimony, after the People had already rested their case, as a means of bolstering Dr. Gabriel's trial testimony. We agree.

First, the trial court allowed Dr. Gabriel to fully testify regarding when he first saw the 3D scan, his change in opinion and his consultation with Dr. Collins, a radiology expert. Accordingly, we reject Moore's argument that excluding Dr. Collins's testimony violated his due process rights by denying him a defense. Defense counsel essentially agreed with the trial court's assessment that Dr. Collins's testimony would corroborate Dr. Gabriel's testimony and impeach the testimony of the prosecution witnesses that Doe had suffered a skull fracture.

We agree that Dr. Collins's proposed testimony that Doe had not suffered a skull fracture would have been cumulative of Dr. Gabriel's testimony. Additionally, as to impeachment, the trial court correctly noted that Dr. Gabriel had essentially impeached

10

himself by changing his opinion based on a piece of evidence Dr. Gabriel never indicated he needed to formulate an opinion. While the prosecution challenged Dr. Gabriel's qualifications to render an opinion regarding the skull fracture because he was not a radiologist, the jury was aware that Dr. Gabriel changed his opinion regarding the skull fracture after consulting with Dr. Collins a "distinguished and experienced professor of radiology."

Moreover, as the trial court noted, Dr. Collins had "a very, very, detailed CV" with 126 pages of attachments. The trial court reasonably concluded it would take the prosecution "weeks" to do a basic investigation regarding publications, reports or studies by Dr. Collins that addressed unknown sutures versus skull fractures and then prepare cross-examination. Under the unusual circumstances of a defense expert changing his opinion mid-trial regarding an injury, we cannot conclude the trial court abused its discretion in precluding Dr. Collins's testimony.

Even assuming the trial court erred in excluding Dr. Collins's testimony, the assumed error was harmless because it was not reasonably probable that a more favorable result would have been reached if Dr. Collins had testified. As we noted above, the trial court allowed Dr. Gabriel to testify regarding his changed opinion; thus, the jury was well aware of the defense contention that Doe had been misdiagnosed with a skull fracture. Defense counsel also argued during closing argument that the misdiagnosis regarding the skull fracture "infect[ed] the reliability of everything else" about Doe's injuries. Even if the defense had been allowed to present Dr. Collins's testimony that Doe had been misdiagnosed with a skull fracture based on his review of Doe's skull images, the jury

11

would have still been required to weigh this testimony against the testimony of Drs. Massi and McCormick, who did not rely on images to make their diagnoses. Rather, Dr. Massi testified he felt swelling above the fracture and the ridges created by the fracture when he physically palpated Doe's skull. Additionally, Dr. McCormick physically examined Doe's actual skull during an autopsy and observed the fracture.

More importantly, however, Dr. Gabriel testified that his change of opinion regarding whether Doe had suffered a skull fracture was a "non-issue" as "[w]hat happened to . . . Doe [was] quite independent of whether or not there [was] a skull fracture." Dr. Gabriel noted that after Doe fell, she cried and then went silent. When Doe stopped crying, Dr. Gabriel opined that Doe suffered an apnea spell (stopped breathing). He further opined that Doe's heart then stopped from lack of oxygen, resulting in no blood flow to Doe's brain and cardiopulmonary arrest. Dr. Gabriel explained that Doe's brain tissue started to die causing the brain to swell. Dr. Gabriel concluded that this brain swelling resulted in Doe's death. Dr. Gabriel also testified that Dr. Stanley's neuropathology report supported his opinion as Dr. Stanley noted that Doe's brain cells were damaged by lack of oxygen.

Dr. Massi similarly testified that Doe's entire brain swelled after being injured. Thus, the critical issue at trial was not whether Doe had suffered a skull fracture, but what caused her brain to swell — an accidental fall or nonaccidental abusive head trauma. On this issue, the jury had before it Moore's admissions that he failed to tell Morales, the paramedics or law enforcement that Doe had fallen and had staged the bed to make himself look better.

12

On this record, we conclude it is not reasonably probable that a more favorable result would have been reached if Dr. Collins had testified.

## II. *Alleged Ineffective Assistance of Counsel*

Moore submits that any alleged deficiencies on behalf of defense counsel were the result of the prosecution's failure to timely disclose Dr. Massi's opinion. As an alternative argument should we disagree, Moore contends he received ineffective assistance of counsel. Specifically, he asserts no competent attorney would fail to retain an expert critical to the defense or violate discovery rules resulting in exculpatory evidence being excluded from trial. To the extent defense counsel stated that a significant factor in not having Dr. Gabriel fully investigate the alleged skull fracture at the outset was to save his client's money, counsel acted unreasonably because as later demonstrated, counsel was able to secure funding from the court to retain Dr. Collins in less than 24 hours.

During the pendency of the appeal, we asked the parties to submit supplemental briefs on whether defense counsel's pretrial investigative work, including his decision to not provide his medical expert with all available discovery material, amounted to ineffective assistance of counsel. Both sides did so. As we shall explain, while we find defense counsel provided ineffective assistance by not providing Dr. Gabriel with all discovery materials, the error was harmless.

A defendant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance

13

resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216, 218 (*Ledesma*).) To establish prejudice, the defendant must show it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

We exercise deferential scrutiny in examining counsel's performance. (*Strickland*, *supra*, 466 U.S. at p. 689; *Ledesma*, *supra*, 43 Cal.3d at p. 216.) The defendant must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics. (*People v. Jackson* (1980) 28 Cal.3d 264, 289.) In examining a claim of ineffective assistance of counsel we defer to counsel's reasonable tactical decisions and presume counsel's conduct fell within the wide range of reasonable professional assistance. (*People v. Weaver* (2001) 26 Cal.4th 876, 925.)

The right to counsel includes the right to effective assistance of a reasonably competent attorney during the pretrial stage of a proceeding. (*People v. Pope* (1979) 23 Cal.3d 412, 423.) "[A] defendant can reasonably expect that before counsel undertakes to act, or not to act, counsel will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation." (*In re Fields* (1990) 51 Cal.3d 1063, 1069.) "[A] defense attorney who fails to investigate potentially exculpatory evidence, including evidence that might be used to impeach key prosecution witnesses, renders deficient representation. [Citations.] California case law makes clear that counsel has an obligation to investigate all possible defenses and should not select a

14

defense strategy without first carrying out an adequate investigation." (*In re Edward S.* (2009) 173 Cal.App.4th 387, 407.)

Here, defense counsel stated in a sworn declaration that he hired Dr. Gabriel to formulate an opinion as to whether Doe suffered inflicted abuse or a tragic accident. Based on Dr. Massi's preliminary hearing testimony that Doe could have sustained a skull fracture falling from a bed and hitting a wooden railing before hitting the floor, defense counsel concluded that how the skull fracture occurred was "a non-issue" and he "believed this to be an extent of injury case; this was not a couldn't get 'the' skull fracture case." Accordingly, defense counsel did not provide every skull imaging picture to Dr. Gabriel because he did not want Dr. Gabriel spending the family's limited funds reviewing an issue counsel believed had been conceded at the preliminary hearing.

We conclude there was no reasonable or tactical explanation for defense counsel's failure to provide Dr. Gabriel with all discovery materials. Defense counsel hired Dr. Gabriel, a medical expert, to review the extent of Doe's injuries and opine as to how they occurred. Defense counsel's declaration, however, suggests he accepted the opinion of the prosecution's medical experts regarding the injuries that Doe suffered, including the skull fracture, and thus decided to not give Dr. Gabriel all of the skull images.

Defense counsel's decision to not provide Dr. Gabriel with all discovery materials was not reasonable. First, it is not likely that providing Dr. Gabriel with all discovery materials would have greatly increased the cost to mount a defense. Additionally, it is impossible for Dr. Gabriel to provide an informed medical opinion regarding *how* Doe's

15

injuries occurred without reviewing all available materials to determine *what* injuries Doe suffered. Although defense counsel acknowledged that the entire case revolved around the extent of Doe's injuries, he apparently assumed the role of a medical expert and agreed with the prosecution's medical experts at the outset of the case that the extent of Doe's injuries included a skull fracture. This decision amounted to a failure to perform an adequate investigation. Nonetheless, as we detailed above, exclusion of Dr. Collins's testimony was harmless. (*Ante*, pt. I.) Thus, Moore cannot show he was prejudiced by defense counsel's error. (*Ledesma*, *supra*, 43 Cal.3d at p. 217 [defendant must establish prejudice to obtain relief on an ineffective assistance claim].)

## DISPOSITION

The judgment is affirmed.

McINTYRE, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

16