Filed 3/22/24  P. v. Hernandez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | F084535 |
| v. | (Super. Ct. No. 20CR-02330) |
| LEONARDO MONDRAGON HERNANDEZ, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County. Carol K. Ash, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant Leonardo Mondragon Hernandez was convicted of numerous sexual offenses against multiple children. He was sentenced to state prison for an aggregate term of 77 years to life.

On appeal, appellant raises the following claims: (1) the trial court erred by precluding his daughter, G.H., from testifying on his behalf and failed to consider and exhaust all lesser sanctions before precluding G.H. as a witness, which prejudicially violated his right to present a complete defense; appellant alternatively requests a remand for an evidentiary hearing pursuant to Penal Code section 1260;[1] (2) appellant was prejudicially denied effective assistance of counsel when his trial counsel failed to investigate all defenses and research the law applicable to the facts, for excluding G.H. as a witness without interviewing her, for not researching and knowing the law regarding a compromised witness, and for apologizing to M.H. during cross-examination; appellant alternatively requests a remand for an evidentiary hearing pursuant to section 1260; (3) the trial court prejudicially erred by treating C.H. as a hostile witness; and (4) cumulative errors prejudicially violated appellant's due process right to a fundamentally fair trial.

We reject appellant's claims and affirm the judgment.

# FACTUAL BACKGROUND

I.      **Prosecution Case**

A.      **Sexual Abuse Against V.A. (counts 1 through 5):**

1.      **V.A.'s testimony**

V.A. testified that appellant had married her maternal aunt, Azucena. V.A.'s mother, E.J., was a single, working parent who "always" left V.A. with appellant and her

---

[1]      Hereinafter, all undesignated statutory references are to the Penal Code.

aunt.  As a result, appellant often watched V.A.  Appellant had two daughters, G.H. and C.H. who V.A. was close to.  Their families were very close and had frequent get-togethers.

Appellant began his sexual abuse of V.A. when V.A. was three or four years old.  The first incident of abuse occurred at appellant's house in Merced while appellant babysat V.A. and C.H. while Azucena was on an errand.  Appellant suggested playing hide-and-seek.  He told C.H. to hide and then grabbed V.A.'s hands, pulled down her pants, and touched and rubbed his fingers inside her vagina.  V.A. stood there in shock; she did not know what to do because he was stronger than she was.  She did not scream because she was in shock.

The next incident of abuse happened during a family birthday party at appellant's house when V.A. was five or six years old.  On V.A.'s way to use the restroom, appellant exited his room, grabbed V.A. and pulled her into his room and locked the door.  Appellant threw V.A. on the bed, pinned down her arms and legs, kissed her, touched her vagina with his hand, and put his mouth on her vagina.  V.A. was in shock but yelled at appellant that she had to pee really bad and he let her go.

Incidents of appellant putting his fingers inside her vagina and putting his mouth on her vagina continued until V.A. was 13 years old.  When V.A. was age seven to nine, appellant put his mouth on her vagina and his fingers inside her vagina multiple times.

After V.A. was nine years old, another incident occurred at appellant's home.  V.A. messaged C.H. asking if she was home alone.  When C.H. replied yes, V.A. walked into appellant's home, expecting C.H. to be there alone, but appellant was on the living room floor lying on a blanket.  V.A. tried to run to C.H.'s room, but appellant jumped up, and used the blanket to forcibly grab V.A. by wrapping his blanket around her, and then forcefully tried to kiss her.  V.A. tried to bite him on the lip, but she could not get away.  Appellant let V.A. go when C.H. came out of her room.  Then V.A. ran with C.H. into C.H.'s room and locked the door.

Overall, appellant's sexual assaults of V.A. occurred from when she was three or four years old to 13 years old. During the incidents, appellant would tell her that she was "so beautiful," "prettier" and "better than his daughters," that she "would do everything right," and that he "wanted his daughters to be just like [her]." He always told V.A. that "everything was okay" and that he "was taking care of [her]." C.H. never knew what happened between appellant and V.A., although there were two times where she interrupted them and may have seen what happened. V.A. never talked to C.H. about it because it was her father. From 10 years old to 13 years old, V.A. started defending herself from appellant, but he was still able to force these acts on her.

When V.A. was younger, she did not tell anyone about appellant's sexual abuse because she feared that she would not be believed. When V.A. was older, she told her fiancé Javier about the abuse because V.A. was having nightmares of appellant and difficulty having sex. Afterwards, V.A. told her mother, E.J. A week before V.A. filed a police report about appellant's abuse, V.A. told C.H. that she needed to talk with appellant and C.H.'s family while her family was present because she could not "take it no more." C.H. relayed this to appellant who said he was ready to talk.

The purpose of the family meeting was to discuss that appellant had sexually abused V.A. The meeting was attended by V.A., appellant, Azucena, C.H. and G.H., E.J. and V.A.'s fiancé, Javier. V.A. wanted everyone to know about appellant's sexual abuse so that they would not think that she was lying when she later filed a police report. V.A. confronted appellant with what he had done. She brought up specific examples of appellant sexually abusing her, such as touching her while he told C.H. to play hide-and-seek and the blanket situation. After each scenario that V.A. mentioned, appellant responded, "Yes, I remember, and I'm sorry." Appellant said something like, " 'If I've done anything to offend you, I apologize,' " that he was sorry for everything he did and went on his knees and begged for forgiveness, but did not shed a tear. V.A. forgave

4.

appellant, but told him that she would never forget what he did and that she would fight for him to be jailed. After, V.A. went alone to file a police report.

V.A. testified that from age six or seven years old until 12 years old, she was a paid employee in appellant's fruit business. According to V.A., at the family meeting, there was never any discussion of using V.A.'s name for appellant's liquor license. V.A. denied that she suggested the store be put in her name and in Javier's name.

### 2. E.J.'s testimony

E.J. said that her daughter V.A. told her things appellant did to her when she was a child. As a result, there was a family meeting at Azucena's house in Merced to discuss what happened. At the meeting, V.A. confronted appellant about sexually abusing her. E.J. testified that appellant said he "had already foreseen this" and that he "was actually going to ask [V.A.] for forgiveness." V.A. gave him specific examples of what he had done to her as a child and he apologized. E.J. testified that at the family meeting, appellant and V.A. never discussed going into business together or utilizing a liquor license.

### 3. Javier's testimony

Javier was V.A.'s ex-boyfriend. He testified that V.A. had told him that she was sexually abused by appellant. Javier was present at the family meeting when V.A. confronted appellant about sexually abusing her. Appellant admitted everything by going on his knees and admitting to everything that came out of V.A.'s mouth and apologizing. V.A. was confronting him about sexually abusing her as a child. Appellant did not provide any details of his own but acquiesced to what V.A. said.

Javier testified that there was no discussion at the family meeting about putting the store under Javier's and V.A.'s names.

### 4.     C.H.'s testimony

C.H., appellant's older daughter, testified that she never witnessed anything sexually happening between appellant and V.A. V.A. never talked to C.H. about appellant touching V.A. when C.H. was a child.

Once in 2018 or 2019 at the store while E.J. was present, V.A. told C.H. and Azucena that appellant had sexually abused her. C.H. said that was the only time V.A. had told her about her father sexually abusing her. C.H. told V.A. that she would support her if she decided to report appellant to the police because C.H. thought V.A.'s allegation was true and C.H. was mad at appellant because she felt that he had abandoned her, Azucena, and G.H.

C.H. agreed that the family meeting was held for the purpose of V.A. confronting appellant about sexually abusing her. According to C.H., her younger sister G.H. was told to go into another room during the family meeting, but V.A. said it would be better if everyone was there. At the meeting, V.A. confronted appellant, but V.A. did not say the specific words that she was sexually assaulted by appellant or confronted him with specific incidents of touching her as a child. She agreed that appellant got on his knees and apologized to V.A., who also got on her knees. Appellant made "a general apology," saying that he was sorry if he ever offended anyone. C.H. claimed that she did not hear anything in the conversation about something sexual happening. C.H. said that appellant and V.A. "made up" and everybody hugged.

C.H. claimed that after V.A. confronted appellant about his sexual abuse at the family meeting, V.A., Javier, and appellant discussed a business deal in everyone's presence. C.H. said that V.A. was excited about having appellant's business in her name. C.H.'s parents could not have the business in their names because they were not citizens and C.H. could not have it in her name because she was not 21 years old. But since V.A. would soon be 21 years old and Javier was 21 years old, they discussed having the

business and its liquor license in V.A.'s and Javier's names.  V.A. "was excited about having the business in her name."  V.A. and Javier said, " 'Yeah.  Yeah.  We'll do it.' "

In November 2019, Merced Police Department Officer Joseph Opinski and Detective Cruz Jasso interviewed C.H. while she was at work at a fruit stand.  C.H. reported to them that when she was about six, she saw appellant on top of seven- or eight-year-old V.A. trying to kiss her, which C.H. tried to forget as a child.  C.H. also reported to them that when V.A. slept over, appellant would stand in the doorway in his boxers, which she described as " 'creepy' "; she did not tell the officers that these events were based on a conversation with V.A.  C.H. reported in her interview that she was present at the family meeting and that appellant apologized to V.A. for molesting her as a child.

At trial, C.H. viewed portions of her interview transcript and claimed that she did not recall saying what was in it.  C.H. claimed that she did not observe anything between appellant and V.A. when she was younger.  C.H. testified that although she had reported that she walked in on appellant on top of V.A. trying to kiss her, that was something V.A. had told C.H., but C.H. did not recall actually observing that.  C.H. admitted that she did not tell Opinski that was because of something V.A. told her, but said that it was what she observed and walked in on.  C.H. acknowledged reporting that when V.A. would sleep over, her father would stand in the doorway in his boxers, which C.H. described as " 'creepy,' " but she maintained that description was based upon what V.A. had told her.  C.H. claimed that she was busy at work when interviewed and that she did not know to say that the reason she said her father was "creepy" was based on her conversation with V.A.  C.H. testified that she did not recall the incident now since it was a long time ago.  Additionally, C.H. did not remember telling Officer Opinski that her father apologized to V.A. for molesting her as a little girl.  Later, in November 2021, C.H. told a defense investigator that at the family meeting, appellant made "a general apology" to everyone if he had offended them.

C.H. admitted it was hard for her to see her father in court and to testify as a witness. C.H. loved her father and admitted she did not want anything to happen to him.

## B. Sexual Abuse Against M.H. (count 6) and E.D. (count 7):

M.H. and E.D. are sisters. M.H. knew appellant because she was friends with his daughter, C.H. M.H. was near the same age as C.H. and E.D. was younger than M.H. Their families were close and they got together almost daily, went to church together, and the mothers worked together.

M.H. testified that around August 2004 when she was eight years old, she visited appellant's home in Merced County for a sleepover with C.H. They slept together in a large bed with appellant positioned furthest to the left, then C.H., then Azucena, and then M.H. Azucena woke up and left for work. Appellant scooted C.H. over and laid next to M.H. Appellant put his arm around M.H. and M.H. told him her dad would not like that and asked him to move his arm please. Appellant then licked M.H.'s right ear and neck and had his fingers on her vagina. Appellant told M.H. she was the prettiest one and asked her to be his girlfriend. While appellant was engaging in that behavior, M.H. was crying and asked if she could call her father. Appellant said she could not and that it was okay, it was almost daytime. M.H. then asked to go to the restroom. When M.H. went to the restroom she got on her knees and prayed to God to make him stop doing what he was doing. M.H. returned to the bed with appellant, and while she was lying on her back, appellant put his leg over her and she felt what she now knows was a hard penis against her. Appellant put his hand in her underwear and put his fingers in her vagina.

M.H. was scared and did not made a noise, and did not try to wake C.H., who remained sleeping. M.H. heard a worker named Marcos outside the bedroom window, but she did not ask him for help because she was scared. M.H. did not try to leave the home because she was scared.

M.H. eventually fell asleep and when she awoke, appellant and C.H. were not in the bedroom.  In the morning, M.H. called her father between 11 and 15 times to pick her up, but he did not answer.  M.H. left numerous voicemails for her father to pick her up.  When he eventually picked her up, she did not tell him what had happened.

A couple of days later, M.H. told her younger sister, E.D., that appellant sexually assaulted her.  Their aunt overheard their conversation and told their mother about it; then their mother told their father about it.  A report was made to law enforcement.

E.D. testified that when she was home in Merced and her parents were outside, appellant grabbed E.D. by the buttocks, lifted her up in the air, sat her on his lap, talked in her ear, and told her that she was beautiful, prettier than her sister, and his favorite.  A couple of times when she was on appellant's lap, he put his hand under her shirt, rubbed her back, put his fingers inside the lining of her skirt, and pulled back her skirt.  Sometimes she tried to get up to walk away, but he yanked her back by her skirt and sat her back on his lap.

At appellant's home, appellant sat E.D. on his lap and talked to her the same way he did at her house, but he did not touch her inappropriately there.  At the time, she did not tell her parents what was occurring.  E.D. also did not tell her teachers or a school nurse.  After her discussion with her sister, M.H., E.D. told her parents.  M.H. and E.D.'s father made a report with law enforcement and brought them to the sheriff's office to be interviewed.

Officer Aaron Rosenberg of the Merced County Sheriff's Office spoke with M.H. and E.D.'s father, J.H., about a sexual abuse report involving appellant.  The officer interviewed nine-year-old M.H., who disclosed the incident in appellant's bedroom, where appellant had kissed and licked M.H.'s ear and asked if she wanted to be his girlfriend.  M.H. reported that after she went to the bathroom and came back to the bedroom, appellant laid down next to her, put his leg over her, rocked back and forth, and

9.

put his hand under her pants, but on top of her underwear without skin-to-skin contact with her vagina.

Officer Rosenberg interviewed seven-year-old E.D. twice. In the first interview, E.D. said that appellant's abuse occurred about 20 times. In the second interview, E.D. said it was 50 times in one month and 40 times in another month. E.D. reported that appellant would grab her, put her on his lap, place his hand palm-up between his thigh and her buttocks over her clothes, rub her back, and tell her that she was the prettiest girl in the family. E.D. reported that appellant never touched her vagina or made skin-to-skin contact with her buttocks.

## II.    Defense Case

Appellant testified that he and Azucena divorced, and they were already separated around the time of the family meeting. In August 2019, he was convicted of misdemeanor domestic violence against Azucena.

Appellant agreed that V.A. was left to be cared for at his home over the years, while C.H. was a child. Appellant admitted he told V.A. that she was pretty, like an uncle who loved his niece, but never said she was prettier than his daughters. Appellant said any physical contact with V.A. was limited to a hug. Appellant denied each of V.A.'s allegations that he sexually assaulted her, claiming that her allegations were lies. Appellant maintained that V.A. never confronted him with sexually abusing her as a child.

Appellant maintained that C.H.'s recorded statement to officers—in which C.H. stated that she saw appellant on top of V.A. as a child, that she saw him try to kiss V.A., and that he apologized at the family meeting for molesting V.A. as a child—was influenced by V.A. Appellant stated that the purpose of the family meeting was to apologize for the differences he and V.A. had before.

10.

Appellant had a fruit stand that was in C.H.'s name but run and owned by Azucena. V.A. began helping at the fruit stand at age 10 or 11, became a paid employee at age 15, and worked there until age 19.

When V.A. was 15 years old, she gave appellant's wife and daughters some marijuana edibles. Appellant confronted V.A. about her doing so and threatened that he would report her to the police if she did so again. Appellant was close friends with V.A.'s father, who was deported because of involvement with drugs. V.A. complained to appellant asking for an explanation because she thought her father's deportation was appellant's fault.

A family meeting occurred in which appellant and V.A. discussed their past conflicts and disagreements, including the edibles incident and V.A.'s father's deportation. They both cried and apologized to each other while appellant was on his knees. When appellant apologized, in his mind he was asking V.A. for forgiveness for having been a little too upset when he confronted her about the edibles and regarding her father. After they apologized, they embraced and ended the meeting on good terms.

After the meeting, V.A. and Javier suggested that appellant put the business in their names. Appellant explained that he had a store, which he could not legally put under his name or his wife's name; so he put it in the name of one of his nieces, but she could no longer have it in her name because she was receiving Medi-Cal. C.H. was not old enough to have it in her name because she was still a minor. Appellant told V.A. and Javier to give him a few days to think it over. Then, the next week appellant learned that V.A. had reported that he had sexually assaulted her.

Appellant stated that V.A. never accused him of sexually molesting her at the meeting and he never confessed to having molested her. When appellant was asked if he knew why V.A. had purportedly lied about him sexually assaulting her, he claimed that she must not have left behind her hard feelings about the edibles and about her father at the meeting.

11.

Appellant testified that M.H. came over once to play with C.H. and slept overnight at their home.  They all slept in the same bed with appellant sleeping next to Azucena, then C.H., and then M.H.  Appellant did not recall having physical contact with M.H. and denied her allegations of sexual assault, which he claimed were lies.  Appellant also denied telling her she was pretty and denied that he did not allow her to call her father.

Appellant also denied E.D.'s allegations of sexual assault, which he claimed were lies.  When appellant was asked if he knew why M.H. and E.D. had purportedly lied about him sexually assaulting them, he explained that he had lent their father, J.H., $10,000 and that J.H. was upset when appellant asked for the money back from him, although he was unsure if that was the reason for their accusations.  Appellant said J.H. still had not repaid that money.

## III.    Verdict and Sentence

Appellant was charged with sexual penetration of V.A., a child 10 years of age or younger (§ 288.7, subd. (b), count 1), oral copulation of V.A., a child 10 years of age or younger (§ 288.7, subd. (b), count 2), aggravated sexual assault by oral copulation of V.A., a child under 14 years of age (§ 269, subd. (a)(4), count 3), aggravated sexual assault by sexual penetration of V.A., a child under 14 years of age (§ 269, subd. (a)(5), count 4), lewd or lascivious act by force or fear upon V.A., a child under 14 years of age (§ 288, subd. (b)(1), count 5) alleging multiple victims (§ 667.61, subds. (a), (e)(4)), lewd or lascivious act upon M.H., a child under 14 years of age (§ 288, subd. (a), count 6) alleging multiple victims (§ 667.61, subds. (a), (e)(4)), lewd or lascivious act upon E.D., a child under 14 years of age (§ 288, subd. (a), count 7).

A jury found appellant guilty of all counts and found the multiple victim allegations to be true.  Appellant was sentenced to 77 years to life in state prison.

## DISCUSSION

**I.  The Trial Court Did Not Abuse Its Discretion in Excluding G.H.'s Testimony.**

Appellant claims that the trial court erred when it excluded G.H. from testifying as a defense witness, which he claims prejudicially violated his constitutional right to present a defense.  Appellant also claims the trial court erred by failing to consider and exhaust all lesser sanctions before precluding G.H. from testifying.  Alternatively, appellant claims that the matter should be remanded for an evidentiary hearing pursuant to section 1260.  The People contend the court properly exercised its discretion in excluding G.H.'s testimony and that even if it erred, appellant has not established prejudice.  The People also contend that appellant fails to demonstrate any basis to set aside the jury's verdict and findings in order to remand for an evidentiary hearing.  We conclude appellant's claim fails.

### A.  Relevant Background

On October 25, 2021, the People made an informal, continuing request for disclosure and discovery of "[t]he names and addresses of persons, other than the defendant(s), whom counsel or defendant(s) intends to call as witnesses at trial" pursuant to sections 1054.3, subdivision (a), and 1054.7.  On April 15, 2022, appellant was present at a hearing on the in limine motions.  There, the trial court granted the People's motion, which was made pursuant to Evidence Code section 777, "[t]hat all actual or potential witnesses be excluded from the courtroom during the trial proceedings."  At the hearing, the court was provided with a proposed witness list.  On April 19, 2022, during voir dire, the court read the witness list to the prospective jurors, which did not include G.H. as a witness.

During trial, after the prosecution rested, appellant elected to testify on his own behalf.  Defense counsel then informed the court of the following:

> "THE COURT:  Okay.  And you wanted to put something else on the record?

13.

"[DEFENSE COUNSEL]: Yes. It's an ancillary issue. It may become important later.

"At [appellant's] request or urging, my investigator attempted to make contact with Suzy or Azucena and [G.H.], and this was—this was around Easter—and did make contact with them, and they expressed an interest in talking to him on Saturday, asked him to wait past Easter Sunday, and they would talk to him on Monday. I'm getting this from my investigator. I've had no contact with these people.

"According to my investigator, when he contacted them on Monday, they were of a different state of mind and refused to and refused to speak with him, and they're not obligated to, so that line of investigation was closed, and [G.H.] is still a minor anyway, so I'm not sure we could have spoken to her without—without an investigator present—I should say without an adult present, a parent or guardian.

"Apparently [G.H.] came to court on her own without my knowing it and has been sitting in the audience today, and I didn't know about it until we just took our break. [Appellant] wants me to call her as a witness. I think I'm impacted by the fact that she sat—that she sat in the audience as a spectator. Also, we haven't interviewed her yet; although, I suspect it would likely be favorable to [appellant]. I don't know—actually know what she would say, but apparently she's also been sitting in the audience as a spectator, which I didn't know about until now.

"So I feel devastated as counsel by that, but I think our office handled things properly and did what we could. If [G.H.] is here as a compromised witness because she didn't—because she didn't talk to us before she chose to appear as a spectator, I guess we have to live with that.

"[C.H.] did offer all of the testimony favorable to the defense that I would expect any other family member to offer, so there's that, and that's kind of where the—the defense case is now.

"[Appellant] is still available to testify and will testify; and, unfortunately, I don't think I'm in a position to call [G.H.] even though she may still be in the courthouse."

The prosecutor opposed the defense calling G.H. as a witness, noting she was never on the witness list. The prosecutor noted that G.H. "was present during all of the testimony of her sister and heard the testimony of [Officer] Opinski." The prosecutor

14.

thought it would be improper to have G.H. testify "given the nature of what she's sat in on, what she's aware of, and [since] there's no permission from her mother."

The court responded, "No, at this point I would not allow her to testify since she did sit in and listen to all of the testimony, and especially if she's a minor, that would cause the Court concern as well, and it is very late [notice]."

Defense counsel explained, "No, I understand, and [G.H.] wasn't on the witness list because we never interviewed her, so I had no reason to think she was a witness until possibly this morning."

After the lunch break, defense counsel informed the court that when he got back to his office for the lunch break, his investigator told him that Azucena called and said, " 'I still don't want to get involved. I don't want to give you a statement. I don't want to testify but my daughters do.' " The defense counsel had his investigator tell Azucena that G.H. could not testify because she sat through the proceedings, was underage and in the courtroom without her mother, but that C.H. did testify.

## B. Standard of Review

"In determining the admissibility of evidence, the trial court has broad discretion." (*People v. Williams* (1997) 16 Cal.4th 153, 196; *People v. Peoples* (2016) 62 Cal.4th 718, 757.) "A trial court's ruling to admit or exclude evidence … is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705, 708 [admitting evidence as a spontaneous declaration]; *People v. Smith* (2003) 30 Cal.4th 581, 627 [expert testimony]; *People v. Pearson* (2013) 56 Cal.4th 393, 443 [expert testimony]; *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476.)

The exclusion of witnesses from the courtroom is a matter within the trial court's discretion. (*People v. Garbutt* (1925) 197 Cal. 200, 205; *People v. Valdez* (1986) 177

15.

Cal.App.3d 680, 687; *People v. Boyden* (1953) 116 Cal.App.2d 278, 283; *People v. Persky* (1959) 167 Cal.App.2d 134, 139; *People v. Willingham* (1969) 271 Cal.App.2d 562, 571; Witkin, Cal. Evidence (2d ed. 1966) § 1100, p. 1018.)  Likewise, a court's exercise of its discretion in sanctioning a violation of discovery is reviewed under the abuse of discretion standard.  (*People v. Ayala* (2000) 23 Cal.4th 225, 299; *People v. Lamb* (2006) 136 Cal.App.4th 575, 581.)

We apply a deferential standard of review upholding the trial court's ruling unless it " 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]."  (*People v. Williams* (1998) 17 Cal.4th 148, 162.)  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)  "An abuse of discretion also occurs if the court applies an erroneous legal standard or its factual findings are not supported by substantial evidence."  (*Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 110.)

### C.    Relevant Law

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' [Citations.]"  (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.)  The California Constitution, article I, section 15, similarly guarantees a defendant the right "to compel attendance of witnesses in the defendant's behalf."  (See also *People v. Capers* (2019) 7 Cal.5th 989, 1008 [right to a compulsory process for obtaining witnesses in his favor].)  It likewise guarantees that a defendant will "not 'be deprived of life, liberty or property without due process of law.' "  (*People v. Ramos* (1984) 37 Cal.3d 136, 153, quoting Cal. Const., art. I, § 15.)

But a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." (*Taylor v. Illinois* (1988) 484 U.S. 400, 410; accord, *Montana v. Egelhoff* (1996) 518 U.S. 37, 42; see *People v. Mincey* (1992) 2 Cal.4th 408, 439–440 [application of ordinary rules of evidence does not deprive the defendant of constitutional right to present defense].) The constitutional right to a meaningful opportunity to present a complete defense is limited by " ' "state … rulemakers['] … broad latitude … to establish rules excluding evidence from criminal trials." ' " (*Nevada v. Jackson* (2013) 569 U.S. 505, 509.) "Only rarely [has the United States Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." (*Ibid*.)

Section 1054.3, subdivision (a)(1) provides, in part, that a defendant and defense counsel shall disclose to the prosecutor "[t]he names and addresses of persons … he … intends to call as witnesses at trial."

Section 1054.5, subdivision (b) provides that "a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.  Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure."  "The court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted."  (§ 1054.5, subd. (c); see *People v. Hammond* (1994) 22 Cal.App.4th 1611, 1624; *People v. Edwards* (1993) 17 Cal.App.4th 1248, 1252–1253.)

Courts have recognized various sanctions for untimely disclosure, including providing the witness's statement to the other party with an opportunity to interview the witness before they testify and additional time if required and requested (*People v. Walton* (1996) 42 Cal.App.4th 1004, 1017, disapproved on another ground in *People v. Cromer*

(2001) 24 Cal.4th 889, 901, fn. 3), posttrial monetary sanctions on defense counsel (*People v. Landers* (2019) 31 Cal.App.5th 288, 295, 306–307), and instructions to the jury on the defendant's delayed disclosure (CALCRIM No. 306 Untimely Disclosure of Evidence; *People v. Thomas* (2011) 51 Cal.4th 449, 480–483; *People v. Riggs* (2008) 44 Cal.4th 248, 306–307).

Evidence Code section 777, subdivision (a) provides in pertinent part that "the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses." The purpose of the order is to prevent tailored testimony and aid in the detection of less than candid testimony. (*Geders v. United States* (1976) 425 U.S. 80, 87; *People v Valdez*, *supra*, 177 Cal.App.3d at p. 687.) Where a witness is offered who violated the court's exclusion order, without fault of the defendant, "the Court might have punished them as for a contempt … [but] constituted no ground for the exclusion of their testimony." (*People v. Boscovitch* (1862) 20 Cal. 436; *People v. Duane* (1942) 21 Cal.2d 71, 80.)

### D. Analysis

Appellant contends that G.H.'s testimony was crucial to the defense in order to contradict V.A.'s testimony that appellant apologized for sexually abusing V.A. at a family meeting, claiming G.H. would have corroborated C.H.'s testimony that appellant only made a general apology to past hurts. First, appellant argues that article I, section 15 of the California Constitution and the Sixth Amendment guarantee his right to compel the attendance of witnesses on his behalf. He claims the trial court deprived him of that right by precluding G.H. from testifying, which deprived him of his right to present a complete defense, in violation of due process of law. Second, appellant contends the trial court's failure to consider and exhaust all lesser sanctions before precluding G.H.'s testimony was erroneous. Third, he claims that precluding G.H. from testifying violated his Sixth Amendment right to compulsory process and to present a complete defense. Fourth,

appellant claims that such error prejudicially contributed to the verdict since the prosecution relied heavily on V.A.'s testimony of events at the family meeting, and these convictions were used to strengthen the prosecutor's weak case on counts 6 and 7. Alternatively, appellant requests the matter be remanded to the trial court to conduct an evidentiary hearing pursuant to section 1260 to hear G.H. testify, "test her evidence, and gauge her demeanor" in order to build a factual record, conceding that appellant has not had the "full and fair opportunity to develop the facts supporting his claim." We conclude the trial court did not abuse its discretion in precluding G.H. from testifying. (See *People v. Ledesma*, *supra*, 39 Cal.4th at p. 705; *People v. Ayala*, *supra*, 23 Cal.4th at p. 299; *People v. Lamb*, *supra*, 136 Cal.App.4th at p. 581; *People v. Garbutt*, *supra*, 197 Cal. at p. 205.)

While a trial court may not ignore the defendant's right to offer testimony of a witness in his favor, "the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests." (*Taylor v. Illinois*, *supra*, 484 U.S. at p. 414.) "The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance." (*Id*. at pp. 414–415; *People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1756.) "A party who creates prejudice to the other side by surprise or newly listed witnesses should not have the advantage of the disadvantage to which he … has placed an opponent." (*Gonzales*, at p. 1757.) Thus, the trial court may exclude the testimony of a newly listed witness where it finds a willful violation of the rules of discovery and resulting prejudice to the prosecution if the witness were allowed to testify, but only after carefully considering the consequence of exclusion to the truth-finding process. (*Id*. at pp. 1757–1758.)

Here, the record shows the trial court weighed and considered multiple factors addressing the reliability of the evidence and potential prejudice in reaching its decision to preclude G.H. from testifying. These factors include:

(a) That the defense attorney just learned about appellant wanting G.H. to testify;

(b) That G.H. had refused to be interviewed in the past and counsel did not know what she would say;

(c) The prosecution objected to the late notice of the witness;

(d) The concern regarding reliability of G.H.'s testimony in listening to trial testimony of her older sister and Officer Opinski;

(e) The lack of notice of the witness given to the prosecution as required under section 1054.3;

(f) The witness was only identified by appellant after the close of the prosecution's case;

(g) The witness was a minor; and

(h) Defense counsel informed the court that "C.H. … offer[ed] all of the testimony favorable to the defense that [he] would expect any other family member to offer."

### 1. Exclusion order

Initially, G.H. violated the exclusion order by remaining in court. The court ordered all witnesses excluded from the courtroom, except the designated investigating officer, pursuant to Evidence Code section 777. G.H. sat in the courtroom and listened to the testimony from her sister C.H. and Officer Opinski before appellant indicated he wanted G.H. to testify. Defense counsel explained that he had no contact with G.H. and was unaware that she was in the courtroom or that appellant wanted her to testify. The trial court noted that G.H. sat in and listened to all of that day's testimony, which caused

20.

the court concern, especially since she was a minor. After listening to the testimony from her older sister, C.H., G.H. could be more impressionable or influenced by her family to tailor her testimony.

### 2. Discovery statute

Appellant also failed to comply with the discovery statute by not providing notice of his desire to call G.H. as a witness until after the prosecution rested. Defense counsel explained that G.H. came to court on her own without him knowing it and that appellant wanted him to call G.H. as a witness. He acknowledged she may be a compromised witness. Defense counsel admitted he did not know what G.H. would testify to, did not think he was in a position to call G.H. as a witness, and assured the court that C.H. offered all of the testimony favorable to the defense that he would expect any other family member to offer. On this record, we conclude the trial court's reasoning was rational and not arbitrary, and thus it properly exercised its discretion in precluding G.H. from testifying. (See *Carmony*, *supra*, 33 Cal.4th at p. 377.)

Appellant relies on *People v. Edwards*, *supra*, 17 Cal.App.4th 1248 and *People v. Superior Court* (*Mitchell*) (2010) 184 Cal.App.4th 451 to argue that precluding a witness for violating the discovery statute under section 1054.5 is allowed only as a last resort, where it has been shown the violation was willful and deliberate. (See *Edwards*, at pp. 1264–1265; *Mitchell*, at pp. 453–454, 459.) However, appellant ignores that *Edwards* and *Mitchell*'s reasoning is limited to cases where a violation of the discovery statute was the sole basis for precluding a witness. Here, as discussed, there were multiple factors the court considered as the reason for precluding the witness, including violating the discovery statute and the exclusion order, that counsel did not know what G.H. would say, and that he believed he had all the testimony he needed. Therefore, *Edwards* and *Mitchell* are not controlling here.

Additionally, in *People v. Gonzales*, *supra*, 22 Cal.App.4th 1744, this court reversed the trial court's decision prohibiting the witness from testifying for failing to

comply with discovery requirements. (*Id*. at p. 1754.) The court concluded that "the exclusion of the testimony of [the defendant's] witness was a violation of the compulsory process clause" because the trial court made no finding that the failure to disclose was willful and there was "no determination of irremediable prejudice or significant prejudice." (*Id*. at p. 1759.) However, *Gonzales* addressed a situation where the witness was precluded from testifying on the sole basis the defendant failed to comply with the discovery statute. (*Id*. at p. 1744.) Because G.H. was precluded from testifying on multiple grounds, not just for failure to comply with the discovery statute, *Gonzales* is not controlling here.

Similarly, appellant's argument that the court failed to consider and exhaust all lesser sanctions for violating the discovery statute before precluding G.H.'s testimony does not recognize that the violation of the discovery statute was not the sole basis for precluding the testimony. The requirement that other sanctions be exhausted before precluding testimony applies when the party has only violated the discovery statute. (See § 1054.5, subd. (c).) As discussed, here, there were multiple violations and factors the court had to consider in reaching its decision.

Consequently, the trial court did not abuse its discretion since its decision to preclude G.H. from testifying was supported by substantial evidence. (See *Carmony*, *supra*, 33 Cal.4th at p. 377; *Kerner v. Superior Court*, *supra*, 206 Cal.App.4th at p. 110.)

### 3. No prejudice occurred

Even if we were to assume the court abused its discretion, appellant cannot show the claimed error resulted in a miscarriage of justice. (See *People v. Ledesma*, *supra*, 39 Cal.4th at p. 705.) "[T]o be entitled to relief on appeal from an alleged abuse of discretion, it must clearly appear the resulting injury is sufficiently grave to manifest a miscarriage of justice." (*In re Richard E.* (1978) 21 Cal.3d 349, 354; *In re K.H.* (2022) 84 Cal.App.5th 566, 606; accord, *People v. Johnson* (2022) 12 Cal.5th 544, 605–606.) The miscarriage of justice requirement permits "reversal only if the reviewing court finds

it reasonably probable the result would have been more favorable to the appealing party but for the error." (*In re Celine R.* (2003) 31 Cal.4th 45, 60, citing *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Hernandez* (2011) 51 Cal.4th 733, 746 [appellant's burden to establish "a reasonable probability that error affected the trial's result"]; accord, *In re Christopher L.* (2022) 12 Cal.5th 1063, 1073.)

Here, appellant fails to establish a reasonable probability that the result would have been more favorable to him if the trial court had not precluded G.H. from testifying. The record does not support appellant's claim that G.H.'s testimony was crucial to the case. Defense counsel explained that G.H. had refused to talk to his investigator, her mother previously refused to let her testify, and as a consequence, defense counsel stated he did not know what G.H. would say if she testified. Appellant's claim that G.H. would have given the same testimony as C.H. is mere speculation, which is not evidence we can consider. (See *People v. Waidla* (2000) 22 Cal.4th 690, 735 [speculation is not evidence].) There is no evidence that G.H. would have testified the same as C.H., or in support of appellant's version of the family meeting.

Moreover, if we were to consider the presumption that G.H. would have given the same testimony as C.H., it would have been cumulative at best. Appellant concedes that C.H.'s testimony already contradicted V.A.'s testimony and corroborated his version of events at the family meeting. At trial, defense counsel admitted he had all the evidence he needed. Therefore, it cannot be ascertained from the record that G.H.'s testimony was crucial to the defense.

We reject appellant's argument that G.H.'s testimony would have been more credible than C.H. due to C.H.'s impeachment by her interview with Officer Opinski. Again, there is no evidence regarding what G.H. would have said and no way to know whether she would have been more credible. C.H. explained that the statements she gave to Opinski about her father were not what she observed but were influenced by V.A. C.H. said she forgot to tell Opinski this came from V.A. because she was in the middle of

23.

working with customers when she gave those statements. Otherwise, appellant concedes C.H.'s statements had been consistent. Thus, there is no evidence that G.H. would have been a more credible witness than C.H. or that her testimony would have made a difference in the outcome of the case.

Additionally, the prosecution's case was extremely strong. Multiple victims testified that appellant sexually abused them. Even appellant's daughter C.H. reported to officers that when she was young she saw appellant on top of seven- or eight-year-old V.A. trying to kiss her, which C.H. tried to forget as a child. C.H. also reported that appellant would stand in the doorway in his boxers when V.A. slept over, which she described as " 'creepy.' "

For counts 1 through 5, each of the prosecution witnesses who attended the family meeting agreed that the purpose of the meeting was for V.A. to confront appellant with sexually abusing her. Even C.H. consistently agreed that the purpose of the meeting was for V.A. to confront appellant about sexually abusing her. The testimony was consistent between appellant, V.A., Javier and C.H. that appellant got down on his knees and apologized to V.A. E.J., Javier, and V.A. testified that appellant apologized to specific examples of sexual abuse given by V.A. C.H. also testified that appellant got on his knees and apologized but said appellant only gave general apologies. However, in her interview with police, C.H. said that at the family meeting, appellant apologized to V.A. for molesting her as a child. Clearly, the jury believed V.A.'s testimony that appellant sexually abused her.

Accordingly, appellant fails to establish a reasonable probability that the result would have been more favorable to him if the court had allowed G.H. to testify. (See *In re Celine R.*, *supra*, 31 Cal.4th at p. 60; *People v. Hernandez*, *supra*, 51 Cal.4th at p. 746.) Thus, a miscarriage of justice did not occur and there was no prejudice.

24.

### 4. Right to present a complete defense

For the same reasons, appellant was not denied an opportunity to present a complete defense. "[M]ore than the mere absence of testimony is necessary to establish a violation of the right." (*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 867.) Appellant personally testified in his defense that V.A.'s allegations did not occur and were lies. Appellant's daughter C.H. testified regarding the family meeting, denying V.A.'s allegations and corroborating appellant's version of the family meeting that appellant only gave general apologies. The defense attorney did not know what G.H. would say and informed the court that C.H. offered all of the testimony favorable to the defense that he would expect any other family member to offer. As such, the record does not support appellant's allegation that he was denied a complete defense. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 367 ["A defendant claiming a violation of this right must establish both that he was deprived of the opportunity to present material and favorable evidence and that the deprivation was arbitrary and disproportionate to any legitimate purpose."].)

### 5. Remand for a hearing under Section 1260

Last, we reject appellant's alternative request for a hearing pursuant to section 1260. "The California Constitution prohibits a judgment from being set aside on appeal absent an error that 'has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*People v. Brown* (2023) 14 Cal.5th 530, 551, fn. 7.) One cannot find reversible error, and thus find authority to reverse, based on "evidence not presented to the trial court," by asking for a "remand." (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 28.)

Evidence Code section 354 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) The substance, purpose, and relevance of the

excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means."

"An offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice. [Citation.] To accomplish these purposes an offer of proof must be specific. It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued. [Citations.]" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 53.)

Here, the record lacks any offer of proof of evidence that would support a miscarriage of justice occurred. Rather, defense counsel admitted he did not know what testimony G.H. would actually provide and conceded he already had the evidence he needed. Appellant appears to request the hearing in order to learn what G.H. would say, by indicating he cannot establish prejudice on the existing record and that he seeks a hearing in order "to listen to [G.H.], test her evidence, and gauge her demeanor." However, a court " 'is limited to the four corners of the record on appeal.' " (*People v. Miranda-Guerrero*, *supra*, 14 Cal.5th at p. 28.) For reasons stated above, appellant has not shown that an error or a miscarriage of justice warrants reversal. (See *People v. Brown*, *supra*, 14 Cal.5th at p. 551, fn. 7.) We decline to remand on the basis of evidence not presented to the trial court. (*People v. Miranda-Guerrero*, *supra*, 14 Cal.5th at p. 28.)

## II.    Ineffective Assistance of Counsel

Appellant claims he received ineffective assistance of counsel on several grounds: that his defense counsel failed to investigate the facts of his case, was ignorant of the law and failed to research the law, and for apologizing to M.H. for making her "relive it." The People argue appellant fails to identify the law defense counsel allegedly failed to research and fails to show his counsel was deficient in his duty to investigate the case.

The People also argue appellant failed to demonstrate his counsel was deficient for apologizing to M.H. We agree with the People and reject appellant's claims.

## A. Relevant Law

A defendant claiming ineffective assistance of counsel must satisfy the two-part test of *Strickland v. Washington* requiring a showing of counsel's deficient performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Id*. at p. 688.)

In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland*, *supra*, 466 U.S. at p. 689; see *People v. Dennis* (1998) 17 Cal.4th 468, 541.) Thus, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. (*Strickland*, at p. 689; *People v. Dennis*, at p. 541.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

" 'Criminal defense attorneys have a " 'duty to investigate carefully all defenses of fact and of law that may be available to the defendant.' " ' " (*People v. Ledesma* (1987) 43 Cal.3d 171, 222; *People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on another ground as stated in *People v. Delgado* (2017) 2 Cal.5th 544, 559; *People v. McDowell* (1968) 69 Cal.2d 737, 746.) "Counsel's first duty is to investigate the facts of his client's case and to research the law applicable to those facts." (*People v. Ledesma*, at p. 222.)

"[N]ormally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make." (*People v. Cleveland* (2004) 32 Cal.4th 704, 746; *People v. Williams*, *supra*, 16 Cal.4th 153, 216–217.)

The prejudice prong requires a defendant to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.)

## B. Analysis

As discussed below, we conclude appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. (See *Strickland*, *supra*, 466 U.S. at p. 687.)

### 1. Duty to investigate.

We reject appellant's argument that his defense attorney failed to investigate carefully all defenses available to him, specifically G.H. as a potential witness. (See *People v. Pope*, *supra*, 23 Cal.3d at p. 425.) The defense attorney explained to the court that he tried to interview G.H., but she refused to speak with his investigator. Additionally, G.H. was a minor and her mother refused to let her speak with the investigator. Although appellant claims that defense counsel failed to investigate G.H when he learned appellant wanted to call her as a witness, there is nothing in the record indicating that G.H. was willing to be interviewed at that time either.

The cases cited by appellant address the failure to investigate witnesses during preliminary investigations of the case in preparation for trial, not after the close of evidence as a last-minute surprise and compromised witness. (See e.g., *People v. Ledesma*, *supra*, 43 Cal.3d at p. 223 [adequate preliminary investigation would recognize the defendant's state of mind at the time of the killing]; *In re Hill* (2011) 198 Cal.App.4th 1008, 1025 [absent a reasonable investigation and trial preparation, Hill's trial counsel did not have an adequate basis on which to make reasonable tactical decisions]; *People v. Jones* (2010) 186 Cal.App.4th 216, 239 [counsel " 'had no knowledge of the possible existence of witnesses' "].) Thus, these cases are not applicable here.

To say that G.H.'s decision to testify came last minute is an understatement. It was not until after the prosecution rested, that appellant told his counsel he wanted G.H. to testify. At this point in the trial, counsel had little to no opportunity to prepare or interview G.H. before having to decide whether to call her as a witness. Regardless, the record does not support appellant's claim that his defense counsel did not know the law regarding his duty to investigate. Counsel explains on the record that he made an effort to interview G.H. but that she refused to speak with his investigator.

Even assuming that defense counsel acted unreasonably by failing to interview G.H. after the close of the prosecution's case, there is no evidence this decision prejudiced appellant. There is nothing in the record about what G.H. would have testified to. Appellant suggests it would have been favorable to him, but this is pure speculation and not evidence we can consider. (See *People v. Waidla*, *supra*, 22 Cal.4th at p. 735 [speculation is not evidence].) At best, it would be the same testimony given by C.H. regarding the family meeting. Even so, this evidence was already before the court, as defense counsel explained. G.H.'s testimony would at best be cumulative, but less reliable since she had already listened to her sister testify. As such, appellant cannot show he would have received a more favorable verdict had defense counsel investigated G.H. and sought to have her testify.

Even if we assume G.H. was willing to be interviewed by defense counsel at trial, there is nothing in the record demonstrating that her testimony would have been favorable or affected the outcome of the verdicts. Although defense counsel assumed G.H.'s testimony would be favorable, he conceded he did not know what G.H. would testify to. Even assuming that G.H.'s testimony would match C.H.'s testimony, then at best, it would have been cumulative, and not add anything other than what was already offered at trial. Defense counsel understood this when he explained to the court he already had all of the evidence he needed. Therefore, appellant cannot demonstrate he

was prejudiced by his counsel's decision to not investigate G.H. as a potential witness at trial.

### 2. Duty to research the law applicable to the facts.

Appellant fails to demonstrate his counsel failed to research the law applicable to his case. Specifically, appellant fails to explain or establish that his defense counsel "misapprehended unreasonably that [G.H.] was a 'compromised witness' who need not be investigated and presented." Appellant does not explain his basis for this allegation, and we find no support in the record that defense counsel misunderstood the law on this subject.

Upon learning appellant wanted G.H. to testify, after she sat through trial testimony, defense counsel addressed the situation with the court reasonably considering the circumstances. The record shows defense counsel not conceding G.H. was a compromised witness, but explained, "*If* [G.H.] is here as a compromised witness … I guess we have to live with that." (Italics added.) In reality, because G.H. was present in court during the testimony of her sister, C.H., and Officer Opinski, she was, in fact, a compromised witness. Appellant fails to demonstrate his counsel misunderstood the law on this subject.

Regardless, appellant cannot demonstrate prejudice. (See *In re Cox* (2003) 30 Cal.4th 974, 1019–1020 [no need to decide whether counsel's performance is deficient where there is no prejudice].) There is no evidence regarding what G.H. would have said if allowed to testify. As such, appellant cannot demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (See *Strickland*, *supra*, 466 U.S. at p. 694.)

### 3. Apology to M.H.

During direct examination, M.H. testified that appellant licked her ear and neck and put his fingers on her vagina. The prosecutor asked, "Was he saying anything to you at this time?" M.H. replied, "Can I take a break, please?" And a short break was taken.

When M.H.'s testimony resumed, she explained that appellant asked her to be his girlfriend and told her that she was the "prettiest one." She reiterated, "he was licking me and he was doing that." During cross-examination, M.H. again testified that appellant licked her ear on the right side of her face and her neck. Thereafter, defense counsel remarked and asked M.H., "So he licks your ear[] and your neck, and I'm sorry that—I'm sorry that we're making you relive it—but he licks your ear[] and your neck, and then what happens after that?"

Later during closing argument, defense counsel stated that "the three complaining witnesses all demonstrated emotion to some degree, [M.H.] most of all maybe." Defense counsel then argued to the jury, "[M.H.] was like any other eight-year-old girl …. She found it difficult to be comfortable sleeping in a strange bed in someone else's residence, especially given the sleeping arrangements, which had four people sharing a bed …. [¶] … [M.H.] tossed and turned all night, finally fell into a disturbed sleep out of sheer exhaustion, … and she did not get up until the family living in the household had already gotten up and left her to sleep late, and that what she claims to have physically experienced was of no more substance than a disturbed dream, but that dream reverberated through the years and was communicated one way or another to [E.D.] and to other members of the [H.] family and then to [V.A.], members of that family, and finally to all of us, and it has now touched or [*sic*] lives, and it was is no more substance than a dream."

Appellant fails to demonstrate that his counsel's apology to M.H. on cross-examination for "making her 'relive it' " fell below an objective standard of reasonableness. As defense counsel acknowledged in closing arguments, M.H. was emotional. The record does not always convey the emotions of the witness while testifying, but here the record shows that M.H. requested a break, which supports the defense counsel's statements M.H. had been emotional.

31.

While the record is silent as to the defense attorney's reason for apologizing, it cannot be said there is no basis for such decision. Counsel chose to address the emotional state of a witness, rather than ignore it. We accord substantial deference to an attorney's tactics during cross-examination. (See *People v. Cleveland*, *supra*, 32 Cal.4th at p. 746; *People v. Riel* (2000) 22 Cal.4th 1153, 1185.) Such decision to apologize may have been to defuse tension with the jury, to show that appellant is not callous, while still disagreeing with M.H.'s version of events. Appellant fails to show there is simply no satisfactory explanation for counsel's action. (See *People v. Anderson* (2001) 25 Cal.4th 543, 569.) On this record, appellant fails to demonstrate counsel's tactical decisions during cross-examination were unreasonable or incompetent.

Contrary to appellant's claims, acknowledging the witness's emotions does not discredit the defense theory that these events were part of M.H.'s dream. Defense counsel addressed M.H.'s emotional reaction but explained to the jury that these events were only part of a bad dream, that as a child, she believed happened. Thus, defense counsel demonstrated skill in carefully diffusing potentially damaging emotions from M.H. while incorporating it to support the defense theory of the case.

We disagree that defense counsel's comment amounted to an opinion on appellant's guilt as in *People v. Torres* (1995) 33 Cal.App.4th 37. As appellant acknowledges, *Torres* addressed an officer's statement made as a witness during trial, which was evidence the jury could consider. Here, defense counsel's comments are not evidence, and the jury was so instructed.

Appellant's reliance on *United States v. Swanson* (9th Cir. 1991) 943 F.2d 1070 is also misplaced. In *Swanson*, the defense counsel told the jury during closing argument that the evidence against the defendant was overwhelming, that he was not going to insult the jurors' intelligence since he did not believe the case came " 'to the level of raising reasonable doubt,' " and told the jury that "if they found Swanson guilty they should not 'ever look back' and agonize regarding whether they had done the right thing." (*Id.* at

p. 1071.)  The court held that the defense counsel's comments "caused a breakdown in our adversarial system of justice." (*Id.* at p. 1074.)  The defense counsel lessened the Government's burden, tainted the integrity of the trial, and abandoned the defense of his client at a critical stage of the criminal proceedings.  (*Ibid.*)  Here, appellant concedes *Swanson* is distinguishable because here, defense counsel's comments were made to a witness during cross-examination and not in closing argument.  We find *Swanson* further distinguishable because showing sympathy to an emotional witness is not remotely equivalent to abandoning his role as an adversary.  An apology to an emotional witness is not the same as communicating to the jury a belief that appellant was guilty.

Nor does appellant demonstrate his counsel's apology to M.H. undermined confidence in the verdict on count 6.  Defense counsel used the fact that M.H.'s testimony was not corroborated, and that when she woke up, C.H. and appellant were not in the room, to support the theory of the case that M.H. merely dreamed the events.  Appellant fails to demonstrate that the defense theory was prejudiced by his apology to M.H.

Accordingly, appellant's claim that he received ineffective assistance of counsel fails.

### 4. Remand for a hearing under Section 1260.

Again, for reasons discussed above, we reject appellant's alternative request for a hearing pursuant to section 1260.  Appellant has not shown that an error or a miscarriage of justice warrants reversal.  (See *People v. Brown*, *supra*, 14 Cal.5th at p. 551, fn. 7.)  We decline to remand on the basis of evidence not presented to the trial court.  (*People v. Miranda-Guerrero*, *supra*, 14 Cal.5th at p. 28.)

## III.  Hostile Witness

Appellant next contends the trial court prejudicially erred when it declared C.H. a hostile witness.  The People claim the court properly exercised its discretion in declaring

C.H. a hostile witness and that even if it erred, any error was harmless. We agree with the People and reject appellant's claims.

## A.     Relevant Factual History

Before the trial court declared C.H. a hostile witness, the prosecutor had moved in limine seeking to impeach C.H., if necessary, because a supplemental interview indicated that "[C.H.] is now, in essence, disputing everything that she told … [Officer] Opinski."

During trial, the People called appellant's daughter, C.H., as a witness. During her direct examination, C.H. testified that once in 2018 or 2019, C.H. was at the store when V.A. told C.H. and Azucena that appellant had sexually abused her. C.H. also testified that at the family meeting, V.A. confronted appellant, but that V.A. did not say that she was sexually abused by him when she was a child.

The following colloquy occurred between the prosecutor and C.H. during direct examination:

> "[PROSECUTOR]:  And during this meeting, [V.A.] confronted your father with sexually abusing her; is that correct?
>
> "[C.H.]:  Um, she didn't say what had happened to her. She just said, um, they were talking. I don't remember so well because it was a while back, but I didn't hear nothing about sexually happening in the conversation. [¶] … [¶]
>
> "[PROSECUTOR ]:  Okay.  So is it your testimony today that [V.A.] never confronted your father with sexually abusing her?
>
> "[C.H.]:  She didn't mention—she did confront him, but she didn't say the specific words that she was sexually assaulted by him.
>
> "[PROSECUTOR]:  Okay.  So she never confronted him with him touching her as a child?
>
> "[C.H.]:  No. I didn't hear that.
>
> "[PROSECUTOR]:  Okay.  She never confronted him with incidents at his house where he would sexually abuse her?

"[C.H.]: No.

"[PROSECUTOR]: Okay. He never got on his knees and apologized to her?

"[C.H.]: Yes. They were apologizing to each other. She got on her knees, too.

"[PROSECUTOR]: So your father got on his knees and apologized to [V.A.]?

"[C.H.]: Yeah, and so did she, um-hum.

"[PROSECUTOR]: Okay. Okay. So it's your testimony today that [V.A.] apologized to your father?

"[C.H.]: They were both—I don't remember if she was apologizing to him, but she was on her knees. I don't know—I don't remember.

"[PROSECUTOR]: So she didn't apologize to your father?

"[C.H.]: I don't remember what was going on.

"[PROSECUTOR]: Okay.

"[C.H.]: She did get on her knees. I didn't hear the word "sorry" or something out of her, but they were both, um—she was crying.

"[PROSECUTOR]: Okay. And the purpose of the family meeting was for your family to discuss that your father had sexually abused [V.A.]?

"[C.H.]: Yes.

"[DEFENSE COUNSEL]: Objection. Leading.

"THE COURT: Overruled. She's not—I'll treat her as a hostile witness.

"[C.H.]: Yeah, they were discussing what [V.A.] had told me and my mom what had happened to her.

"[PROSECUTOR]: Okay. And that's sexual abuse?

"[C.H.]: Um, yes."

35.

## B.    Relevant Law

Evidence Code section 765, subdivision (a), provides that "[t]he court shall exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth …."

"Except under special circumstances where the interests of justice otherwise require:  (1) A leading question may not be asked of a witness on direct or redirect examination.  [¶]  (2) A leading question may be asked of a witness on cross-examination or recross-examination."  (Evid. Code, § 767, subd. (a).)

"A 'leading question' is a question that suggests to the witness the answer that the examining party desires."  (Evid. Code, § 764; accord, *People v. Williams* (1997) 16 Cal.4th 635*, 672.)  " 'A question may be leading because of its form, but often the mere form of a question does not indicate whether it is leading.  The question which contains a phrase like "did he not?" is obviously and invariably leading, but almost any other type of question may be leading or not, dependent upon the content and context....  The whole issue is whether an ordinary man would get the impression that the questioner desired one answer rather than another.  The form of a question, or previous questioning, may indicate the desire, but the most important circumstance for consideration is the extent of the particularity of the question itself.' "  (*People v. Williams*, *supra*, 16 Cal.4th at p. 672, quoting 1 McCormick on Evidence (4th ed. 1992) § 6, pp. 17–18.)  Additionally, a question is leading if it " ' "instructs the witness how to answer on material points, or puts into his mouth words to be echoed back, ... or plainly suggests the answer which the party wishes to get from him." ' "  (*Williams*, at p. 672, quoting 3 Wigmore, Evidence (Chadbourn ed. 1970) § 769, p. 155.)  " 'A question calling for a "yes" or "no" answer is a leading question only if, under the circumstances, it is obvious that the examiner is suggesting that the witness answer the question one way only, whether it be "yes" or "no." ' "  (*Williams*, at p. 672, quoting 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 27.8, p. 762.)

Leading questions may be asked of a witness on direct or redirect examination in " 'special circumstances where the interests of justice otherwise require.' " (*People v. Williams*, *supra*, 16 Cal.4th at p. 672.) "The rule is … long established that permitting the use of leading questions on direct examination when the prosecution is faced with a hostile witness is a special circumstance." (*People v. Spain* (1984) 154 Cal.App.3d 845, 853.)

"Because assessment of the circumstances revealing the witness' hostility is uniquely within the realm of the trial court, the use of leading questions on direct examination is committed to the sound discretion of the trial court." (*People v. Spain*, *supra*, 154 Cal.App.3d 845, 853; *Williams*, *supra*, 16 Cal.4th at p. 672 ["Trial courts have broad discretion to decide when such special circumstances are present."]; *People v. Maxey* (1972) 28 Cal.App.3d 190, 197 [courts have broad discretion in such matters].) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.)

## C.     Analysis

Appellant argues the trial court erred in treating C.H. as a hostile witness. First, he contends that since the prosecution was not allowed to ask leading questions on direct examination, the defense counsel's leading objection should have been sustained. Alternatively, appellant argues that the prosecutor's question was not leading and therefore, the objection should have been overruled. Appellant contends that any special circumstances allowing the witness to be treated as a hostile witness were not present. Additionally, appellant argues that calling C.H. a hostile witness erroneously suggested to the jury that her testimony was not wholly based on facts and usurped the jury's function to determine her credibility. We reject each of appellant's contentions.

We cannot conclude the trial court abused its discretion in considering C.H. to be a hostile witness, which allowed the prosecutor to ask leading questions. The record

supports the notion that the question, "And the purpose of the family meeting was for your family to discuss that your father had sexually abused [V.A.]?" was leading. It is clear the expectation of this question is that the "correct" answer would be yes. The question is suggesting to the witness that the purpose of the family meeting was to discuss appellant's sexual abuse of V.A., to which she agrees. This question is, by definition, a leading question. (See Evid. Code, § 764 [a leading question suggests to the witness the answer that the examining party desires]; accord, *Williams*, *supra*, 16 Cal.4th at p. 672.) The parties' response to the question provides additional guidance. The defense attorney clearly perceived the question to be leading as he objected on such grounds. Additionally, if the question did not come across as leading, the court would have simply overruled the objection. However, the court responded by finding the special circumstance existed that C.H. was a hostile witness and allowed the leading question.

We further conclude the trial court did not abuse its discretion in declaring C.H. a hostile witness. (See *People v. Spain*, *supra*, 154 Cal.App.3d at p. 853.) The court was aware of C.H.'s relationship to appellant as his daughter, her inconsistent statements, her lack of recall about what had occurred at the family meeting, and her inconsistent testimony about whether V.A. had apologized to appellant. As such, the record shows the court's factual finding was supported by substantial evidence. (See *Kerner v. Superior Court*, *supra*, 206 Cal.App.4th at p. 110; see *People v. Spain*, *supra*, 154 Cal.App.3d at pp. 852–853.)

We reject appellant's claim that the trial court's comment declaring C.H. a hostile witness "erroneously suggested to the jury that [C.H.'s] testimony had not been based wholly upon the facts, usurped the jury's function to determine her credibility, and placed a judicial imprimatur on the People's position." A judicial comment on the evidence or the credibility of a witness is evaluated " 'on a case-by-case basis, noting whether the peculiar content and circumstances of the court's remarks deprived the accused of his

right to trial by jury.' " (*People v. Sanders* (1995) 11 Cal.4th 475, 531–532.) The court may comment so long as its remarks are " 'accurate, temperate, and "scrupulously fair" ' " and do not invade the jury's province. (*Id.* at p. 531.) Here, we have already concluded the court did not abuse its discretion in declaring C.H. a hostile witness. Thus, the court's comment on C.H. being a hostile witness was correct and brief, as it was limited to that one ruling. Under these circumstances, the trial court's comment was not improper.

Nor is there any evidence the court's comment prejudiced appellant. The jury knew C.H. was appellant's daughter, heard C.H.'s inconsistent statements, and listened to her inability to recall what occurred at the meeting or what she had previously told officers. Therefore, they would have perceived on their own that C.H. was "hostile" to the prosecution. The court instructed the jury "[d]o not take anything I said or [did] during the trial as an indication of what I think about the facts, the witnesses or what your verdict should be." The court also instructed the jury on how to judge the credibility or believability of witnesses. Absent evidence to the contrary, we presume the jury followed the court's instructions. (*People v. Prince* (2007) 40 Cal.4th 1179, 1295; *People v. Sanchez* (2001) 26 Cal.4th 834, 852; see *People v. Yoder* (1979) 100 Cal.App.3d 333, 338 [reviewing court assumes that jurors are intelligent people capable of understanding and correlating all instructions that are given].) Therefore, appellant's claim fails.

## IV.    Cumulative Error

Appellant last contends that cumulative errors prejudicially violated his due process right to a fair trial. Under the cumulative error doctrine, the reviewing court must review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a more favorable result to the defendant. (*People v. Doane* (2021) 66 Cal.App.5th 965, 984.) However, appellant has failed to demonstrate there were any errors, let alone errors that "substantially impair

cumulatively defendant's right to a fair trial." (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795; *Chambers v. Mississippi* (1973) 410 U.S. 284, 298, 302–303.) Therefore, this claim fails.

## **DISPOSITION**

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:


FRANSON, J.


SNAUFFER, J.